Mr. Justice Hagner
delivered the opinion of the court.
Mr. Morris S. Miller, of Oneida county, New York, presented himself in the General Term and asked its leave to file what he called a petition of right. The purpose disclosed by his statement and elaborate brief, was to procure from this court a declaration that the Ac! of January 16, 1883, and its supplements, establishing what is known as the Civil Service Commission, are unconstitutional and void; and to obtain its interposition, by some form of order, by injunction or otherwise, to put a stop to what he alleged to be a continued usurpation by the officials of that commission upon the rights of the citizen.
Sitting as an appellate court, we refused to grant the leave; and the petition was then presented to the circuit court, and certified to be heard here in the first instance, and was elaborately argued by Mr. Miller. In compliance with the suggestion of the court, the counsel has since furnished us with a number of additional authorities, establishing, as he conceived, the existence of the jurisdiction here and the propriety of the action invoked.
Unprecedented as the application was, it nevertheless appeared to the court that its duty required it to examine with care, a claim presented in respectful terms by a citi *508 zen asking its interposition, irrespective of its antecedent convictions, and we have given careful attention to the arguments and numerous authorities presented by the petitioner, and to all others attainable, bearing on the subject.
The records of this court extending back eighty-six years, contain no reference to such a proceeding, and no case of the kind appears in any other of the courts of the United States, stretching back ten years further.
A careful search has discovered two cases in the Court of Appeals of Virginia (Commonwealth vs. Beaumarcheis, 3 Call., 107, and Att'y-Gen’l vs. Turpin, 3 H. & M. 548), decided early in this century, in which it was insisted on the part of the Commonwealth that the suitors in those cases should have presented their claims against Virginia by way of petition of right in the manner pointed out in a statute passed soon after the Revolution, as a mode of claiming title to escheated lands by British subjects ; but the pretension in each case was overruled by the court. The statute is referred to by Judge Tucker, in 4 Tucker’s Blackstone, p. 356, but there is no more countenance given by the American authorities to the claim that the petition of right is now recognized here as an existing form of remedy, than that wager of battle or the peine forte et dure survive as parts of the machinery of the law in the United States.
We must refer to the ancient treatises even for a definition of the proceeding here invoked. In the argument, there has been a constant tendency to confuse the subject, at times with the right of petition, and again with the provisions of the great parliamentary declaration of the liberties of the people of England assented to by Charles I, at the commencement of his reign, known in English history as’the petition of right. Of course, neither of these matters has any relation to the subject before us. The right of petition antedates all constitutions and statutes; it is the inalienable privilege of the citizen, and is a sensible and, in a just case, an efficacious method of procuring from the legislature the repeal or modification of objectionable laws. *509 On the other hand, the reasonable demands of the parliamentary petition of right inhere in our system of government itself, and are further secured by the explicit declarations of the Constitution.
Blackstone adopts from Bacon’s Abridgment (Prerogative E., 7) his explanation of the present proceeding, in the English law. Having its origin in the idea that the King had a prei’ogative not to be sued in his own courts, it was devised as a substitute for an ordinary suit, that the citizen should not be without redress where his rights of property had been invaded by the sovereign, “ the person of the chief magistrate being set out of the reach of coercion.” (3 Black. Com., 255.) “ The common law methods of obtaining possession or restitution from the Crown, of either real or personal property, are: 1st, by petition de droit or petition of right, which is said to owe its origin to King Edward I; 2d, by monstrance de droit, manifestation or plea of right; both of which may be prosecuted either in the chancery or the Exchequer. The former is in use, where the King is in full possession of any hereditaments or chattels, and the petitioner suggests such a right as controverts the title of the Crown, grounded on facts disclosed in the petition itself, * * * and then upon this answer being endorsed or underwritten by the King, soit droit fait al partie, a commission shall issue to inquire of the truth of the suggestion,” &c. ,
From this statement it is clear the present would not be a case for this proceeding, even if the jurisdiction existed in this court to entertain it. There is no pretence that the sovereign is in possession of any hereditaments or chattels of the petitioner. Disclaiming to be an applicant for office before the commission, as a private citizen only, he complains that Congress, in the forms of the Constitution, has seen fit to enact a law which he considers oppressive and unconstitutional. Its oppression is said to be shown by the vexatious restrictions and annoying examinations to which an applicant for office is subjected by rules of the Civil Service Commission before he can obtain an *510 appointment. As a specimen of this wrong, we are told that with the design of tripping np the candidate, he is asked to “ solve the equation of the fifth degree,” which he asserts is unsolvable. Its alleged unconstitutionality consists in its interference with the official rights of the President and heads of departments, in the power of appointment. But by no liberality of construction could these alleged outrages be brought within the category of the class of wrongs described in Blackstone’s definition.
Without pretending that he has personally been injured by the law, in any wise, and avowing that he has no personal grievance in the premises, and has no purpose to apply for official position, his complaint is an abstract protest against a statute which we are to infer he would have' opposed if he had been in Congress when it was under discussion.
It is true that the government of Great Britain, under the provisions of a statute of Victoria, accords to aliens, as well as to its own citizens, the privilege of prosecuting claims against it, by a petition of right. Adhering still to the fundamental idea that the king can do no wrong, its courts could not be allowed to issue mandatory process against the sovereign. U. S. vs. O’Keefe, 11 Wall., 182.
But in this country, the citizen is not so remediless to obtain an adjudication of right sagainst the Government,, as to require the ingrafting of such an exceptional form of procedure upon our judicial system. It has been well settled by the highest courts that the citizen may vindicate his rights by ordinary action against the Government officials in possession of the property claimed. Brown vs. Hugor, 21 How., 308, Kauffman vs. Lee, 106 U. S., 196.
In the latter case Lee brought suit against Kauffman, a Government official, in charge of the National Cemetery at Arlington, to recover possession of the estate. It was held by the Government under purchase at a tax sale, the proceedings attending which, it was^ insisted, were irregular and void.
On the part of the United States, intervening in the case,, *511 it was contended that the possession of the estate by Kauffman, as superintendent of the cemetery, was only the possession of the United States, and that the action was in effect a suit against the United States, which could not be sustained without its expressed assent. A majority of the Supreme Court overruled this objection and held that this doctrine liad no application where officers of the United States, holding property for public uses, are sued by one claiming to be the owner; and that the lawfulness of the title of the United States to the property may, in such a proceeding, be adjudged by a competent tribunal.
In the able judgment delivered in the case, the doctrine is thoroughly discussed on both sides. In the opinion of the court the difference in the conditions surrounding the Governments of the United States and of Great Britain are pointed out in these words by Justice Miller:
“Notwithstanding the progress which has been made, since the days of the Stuarts, in stripping the crown of its powers and prerogatives, it remains true to-day that the monarch is looked upon with too much reverence to be subjected to the demands of the law as ordinary persons are, and the king-loving nation would be shocked at the spectacle of their queen being turned out of her pleasure-garden by a writ of ejectment against the gardener. The crown remains the fountain of honors, and the surroundings which give dignity and majesty to its possessor are cherished and enforced all the more strictly because of the loss of real power in the government.
“ It is not to be expected, therefore, that the courts will permit their process to disturb the possession of the crown by acting on its officers or agents.
“Under our system, the people who are there called subjects, are the sovereigns. Their rights, whether collective or individual, are not bound to give way to a sentiment of loyalty to the person of a monarch. The citizen here knows no person, however near to those in power, or however powerful himself, to whom he need yield the rights which the law secures to him when it is well administered.”
*512 And in discussing the question whether the Government should only be impleaded according to the practice in England, by the petition of right, the court says:
“ It is believed that this petition of right, as it has been practiced and observed in the administration of justice in England, has been as efficient in securing the rights of suitors against the crown in all cases appropriate to judicial proceedings, as that which the law affords to the subjects of the King in legal controversies among themselves.
“There is in this country, however, no such thing as the petition of right; as there is no such thing as a kingly head to the nation, or to any of the States which compose it."
These considerations are conclusive that we are without authority to grant the prayer of the petition.
But a further objection to our interference is to be found in the consideration that the entire subject is one pertaining to the political department of the Government, and, therefore, is not cognizable by the judiciary. Mississippi vs. Andrew Johnson, 4 Wall., 475; Georgia vs. Stanton, 6 Wall., 56.
In the extended argument of the petitioner, we were much pressed to give our views as to the constitutionality of this Act of Congress, especially as it was stated that a former application by way of petition for a quo warranto had been dismissed by Judge Wallace, of the Southern District of Dew York, upon technical grounds alone. We are not here to decide moot questions, where we are without jurisdiction to adjudicate. But in deciding the case, as we do upon points outside of the statute, it may be as well, to-prevent the renewal of the question here in another form, to add that our refusal to decide upon the many objections raised to its validity, in no degree arises from any doubts of the constitutionality of the act. We content ourselves •with citing the following language of the Supreme Court, in U. S. vs. Perkins, 116 U. S., 483, where the constitutionality of the statute was attacked:
“ It is further urged that this restriction of the power of removal is an infringement upon the constitutional preroga *513 tivU of the executive, and so of no force, but absolutely void. Whether or not Congress can restrict the power of removal incident to the power of appointment of those •officers who are appointed by the President, by and with the consent of the Senate, under the authority of the Constitution (Article 2, sec. 2), does not arise in this case and need not he considered.
“ We have no doubt that when Congress, by law, vests the appointment of inferior officers in the heads of departments, it may limit and restrict the power of removal as it deems best for the public interest. The constitutional authority in Congress to thus vest the appointment implied the authority to limit, restrict and regulate the removal by such laws as Congress may enact in relation to the officers so appointed.
“ The head of a department has no constitutional prerogative of appointment to offices independently of the legislation of Congress, and by such legislation he must be governed, not only -in making appointments, but in all that is incident thereto.”
The application is overruled and the petition is dismissed.