BELDING et al. v. HEBARD.

(Circuit Court of Appeals, Sixth Circuit. July 13, 1900.)

No. 783.

1. STATE BOUNDARIES—LINE BETWEEN NORTH CAROLINA AND TENNESSEE.

It was the evident intention of the North Carolina cession act of 1789, by which Tennessee was ceded to the United States, to make the crest of the great mountain ranges extending across the state in a southwesterly direction the boundary of the ceded territory, and such intention must be given effect in determining the boundary from the cession act and the acts confirming its survey and location in 1821 by the joint commission, which was authorized to settle, run, and re-mark the line "agreeably to the true intent and meaning" of the act of cession.

2. SAME—CONSTRUCTION OF BOUNDARY ACTS.

The cession act calls for certain well-known natural objects in the boundary, among which is the "Great Iron or Smoky Mountain"; the next call being, "thence along the main ridge of said mountain to the place where it is called 'Unicoy' or 'Unaka' Mountain." The Tennessee river crosses the boundary between said two mountains, and the confirmatory acts, after locating the line to Bald-Rock on the summit of the Great Smoky Mountain, "and continuing southwestwardly on the extreme height thereof" to the river, contain the following call: "From Tennessee river to the main ridge, and along the extreme height of the same, to the place where it is called 'Unicoy' or 'Unaka' Mountain." Immediately across the river from the point where the line strikes it is the end of Hangover ridge, which extends southwestwardly, and constitutes the "main ridge," leading from the river to the Unaka Mountain. Along such ridge, within eight miles from the river, are found two or three trees marked as state-line trees in the same manner as those in other parts of the boundary. Another line, designated by trees marked in the same manner, is found extending from the mouth of Slick Rock creek, which empties into the river half a mile to the westward, extending up said creek in a southwesterly direction some seven miles, thence westwardly along a spur to Fodder Stack ridge, thence south along said ridge until it intersects Hangover about eight miles from the river. On this line are 41 trees, the most of them along or near the creek; and all the line trees on both lines appear to have been marked in 1821. The average height of Fodder Stack ridge is some 800 feet less than that of Hangover. Neither the report of the commission nor the field notes of the surveyor are in existence. Held, that the evidence afforded by the marked trees along the westerly of the two lines was not sufficient to overcome the presumption in favor of the other line along Hangover, arising from the fact that it answered the two principal calls of the boundary acts,—that for a southwestwardly course, and that for the "extreme height" of the "main ridge."

3. SAME—CONTROLLING EFFECT OF CALLS FOR NATURAL OBJECTS.

The call in the confirmatory boundary acts, "From Tennessee river to the main ridge, and along the extreme height of the same," in the absence of further description, requires a straight line from the known monument on the north side of the river to the top of the main ridge, and cannot be answered by a line running up the valley of a creek to the west of such ridge for several miles.

4. SAME.

It is a universal rule that permanent natural objects called for in a boundary will control those which are less certain.

5. SAME—RECOGNITION AND ACQUIESCENCE.

It having been found as a fact from sufficient evidence furnished by the confirmatory acts of the two states, based on the report of the joint commission, and by the natural objects therein designated, that the state boundary was actually run and established along Hangover ridge, that boundary could not be changed by the action of the state authorities in

recognition of the other line claimed, unless such recognition has been so long and continuous on the part of both states as to create a mutual estoppel, and constitute an adoption of such line as the true and established boundary. It is not sufficient to create such estoppel or constitute such adoption that the surveyor general of Tennessee, in 1836, stopped the survey of lands adjacent to the boundary ceded by the Indians at the marked line of trees on Slick Rock creek, and that for that reason, and because of such marked trees, such line was generally reputed to be the boundary until 1882; it appearing that no grants of any of the lands in the disputed territory were made by North Carolina prior to 1853, and no settlers entered it until 1860, and very few thereafter, all of whom were squatters without title, who have claimed citizenship in one or the other state, as best served the interests of their landlords; and that since 1882 grants have also been made by Tennessee, and opinion as to the true boundary has been divided.

6. FEDERAL COURTS—EVIDENCE—FOLLOWING STATE DECISIONS.
    In suits involving land titles the courts of the United States follow the rules established by state decisions as to evidence.

Appeal from the Circuit Court of the United States for the Northern Division of the Eastern District of Tennessee.

This is a bill to restrain trespass and remove a cloud from the title to a large tract of wild mountain land claimed to lie within the Seventeenth civil district of Monroe county, Tenn. The complainant claims title under a grant from the state of Tennessee. The defendants claim title to the same under a grant from the state of North Carolina. The title turns upon the location of the boundary line between the state of North Carolina and the state of Tennessee, and the object of the bill is to have the state line ascertained and determined between the Little Tennessee river and a mountain peak called "Stratton Bald," a distance of some seven or eight miles from the point where the state line crosses the Little Tennessee river. The claim of the complainant, Charles Hebard, is that the said state line crosses the Little Tennessee river about one-half mile below where Slick Rock creek runs into the river; thence directly to the Hangover ridge, and along the extreme height of that ridge to its junction with another ridge called the "Fodder Stack Ridge." This contention, if sustained, places the lands lying between the Hangover ridge and Slick Rock creek within the state of Tennessee, and confirms the title to Hebard under his Tennessee grant. The defendants, on the other hand, contend that the line crosses the Little Tennessee river at or near the mouth of Slick Rock creek, and runs up said creek, following its meanders, something over six miles; then up a ridge leading from the creek to the Big Fodder Stack, and then southwestwardly with the top of the Big Fodder Stack lead to its junction with the Hangover lead. In other words, defendants insist that for a distance of nearly six miles the state line follows Slick Rock creek, and that the lands lying east of the creek, and between it and the crest of the Hangover spur, were on the North Carolina side of the line, and therefore subject to grant by North Carolina.

The territory now comprising the state of Tennessee was ceded by the state of North Carolina, in 1789, to the United States. The cession act describes the eastern boundary line as follows: "Beginning on the extreme height of the Stone Mountain, at the place where the Virginia line intersects it, running thence along the extreme height of the said mountain to the place where the Wautauga river breaks through it; thence a direct course to the top of the Yellow Mountain, where Bright's road crosses the same; thence along the ridge of said mountain, between the waters of Doe river and the waters of Rock creek, to the place where the road crosses the Iron Mountain; from thence along the extreme height of said mountain to where Nolinchucky river runs through the same; thence to the top of the Bald Mountain; thence along the extreme height of the said mountain to the Painted Rock, on French Broad river; thence along the highest ridge of the said mountain to the place where it is called the 'Great Iron' or 'Smoky' Mountain; thence along the extreme height of the said mountain to the place where it is called 'Unicoy' or

'Unaka' Mountain, between the Indian towns Cowee and Old Chota; thence along the main ridge of the said mountain to the southern boundary of this state." The line here to be ascertained is included within the call beginning "thence along the extreme height of the said mountain to the place where it is called Unicoy or Unaka Mountain." The mountain whose extreme height is to be followed until Unaka Mountain is reached is the "Great Iron or Smoky Mountain." The necessity for a definite location and marking of the line became evident to both states, and in 1821, under acts passed by each state, a joint commission was appointed for the purpose of settling, running, and re-marking the boundary line. The Tennessee commissioners were appointed under an act which provided that the commissioners should "settle, run and re-mark the boundary line between this state and the state of North Carolina, agreeably to the true intent and meaning of the said act of the general assembly of the state of North Carolina, entitled: 'An act for the purpose of ceding to the United States of America certain western lands therein described.'" Acts Tenn. 1820, c. 22. The North Carolina act, providing for the running of the line, was substantially identical with the Tennessee statute above set out. 2 Ired. & B. Rev. St. N. C. p. 94. The joint commissioners did run and re-mark the line, and each state passed an act ratifying, confirming, and adopting the line as run and reported by the commissioners. Acts Tenn. 1821, p. 45, c. 35; 2 Ired. & B. Rev. St. N. C. p. 96. The Tennessee confirmatory act is as follows: "Be it enacted by the general assembly of the state of Tennessee, that the dividing line run and marked by Alexander Smith, Isaac Allen and Simeon Perry, commissioners for and on behalf of this state, and James Mebane, Montfort Stokes and Robert Love, commissioners for and on behalf of the state of North Carolina, which dividing line, as run by said commissioners, begins at a stone set up on the north side of Cataloochee turnpike road, and marked on the west side, 'Ten., 1821,' and on the east side, 'N. C., 1821'; running thence on a southwestwardly course to the Bald Rock, on the summit of the Great Iron or Smoky Mountain, and continuing southwestwardly on the extreme height thereof to where it strikes Tennessee river, about seven miles above the old Indian town of Tallassee, crossing Porters Gap at the distance of twenty-two miles from the beginning, passing Meigs' boundary line at thirty-one and a half miles, the Equovettly path at fifty-three miles, and crossing Tennessee river at the distance of sixty-five miles from the beginning; from Tennessee river to the main ridge, and along the extreme height of the same to the place where it is called the 'Unicoy' or 'Unaka' Mountain, striking the old trading path leading from the valley towns to the overhills towns, near the head of the west fork of Tellico river, and at the distance of ninety-three miles from the beginning; thence along the extreme height of the Unicoy or Unaka Mountain to the southwest end thereof, at the Unicoy or Unaka turnpike road, where a corner stone is set up marked 'Ten.' on the west side, and 'N. C.' on the east side, and where a hickory tree is also marked on the south side 'Ten., 101 M.,' and on the north side 'N. C., 101 M.,' being one hundred and one miles from the beginning; from thence a due course south two miles and two hundred and fifty-two poles to a spruce pine on the north bank of the Hiwassee river, below the mouth of Cane creek; thence up the said river the same course about one mile, and crossing the same to a maple marked 'W. D.' and 'R. A.,' on the south bank of the river; thence continuing the same course due south eleven miles and two hundred and seventy-three poles to the southern boundary line of the state of Tennessee and North Carolina, making in all one hundred and sixteen miles and two hundred and twenty-three poles from the beginning, and striking the southern boundary line twenty-three poles west of a tree in said line marked '72 M.,' where was set up by said commissioners a square post, marked on the west side 'Ten., 1821,' and on the east side 'N. C., 1821,' and on the south side 'G.,' be, and the same is hereby ratified, confirmed and established as the true boundary line between this state and the state of North Carolina." The boundary is described in the North Carolina confirmatory act in words identical with those used in the Tennessee act, but concludes with these words: "The whole distinctly marked with two chops and a blaze on each fore and aft tree, and three chops on each side line tree, and mile marked at the end of each mile." That part of the line here involved begins with the words, "from Tennessee river to the main

ridge, and along the extreme height of the same to the place where it is called the 'Unicoy' or 'Unaka' Mountain."

After some evidence had been taken, the circuit court "ordered that the cause be, and hereby is, referred to Asbury Wright, Esq., of Roane county, Tennessee, as special master, who will, from the proof on file and such other proof as shall be offered by the parties, report to the court the true state line between the state of Tennessee and the state of North Carolina, from the Little Tennessee river to the junction of the Hangover and Fodder Stack ridges, as run and located by the commissioners of the states of North Carolina and Tennessee in 1821, and confirmed by the respective legislatures of said states." A great mass of evidence was taken, and from the entire evidence the special master reported "that the line between the states of Tennessee and North Carolina, from the Little Tennessee river to the junction of the Hangover and Fodder Stack ridges, as run and located by the commissioners of said states in 1821, and confirmed by the respective legislatures of said states, crosses the Tennessee river at the point where it reaches the river on the northeast side, and from the river runs up the Hangover lead, as shown on complainant's map, and along the extreme heights of this ridge, * * * to the junction of the Hangover with the Fodder Stack." This report included a full finding of the facts material to the conclusion reached, some of which will be hereafter referred to. The defendants excepted generally and specially to the findings and conclusions of the master. These exceptions were overruled, and the conclusions of the master adopted, and a decree pronounced establishing the title of complainant. From this decision the defendants have appealed.

E. T. Sanford and T. F. McGarry, for appellants.

S. T. Webb and T. E. H. McCroskey, for appellee.

Before TAFT,[1] LURTON, and DAY, Circuit Judges.

LURTON, Circuit Judge, after making the foregoing statement of the case, delivered the opinion of the court.

The intention of the North Carolina cession act of 1789 was to make the crest of the great mountain ranges extending across the state of North Carolina in a southwestwardly direction the boundary line of the ceded territory. This is most evident from even a casual reading of the boundary line therein described. The Painted Rock on the French Broad river is a natural monument of great notoriety. From that point the calls in the cession act are, "Thence along the highest ridge of said mountain to the place where it is called the 'Great Iron' or 'Smoky' Mountain; thence along the main ridge of said mountain to the place where it is called 'Unicoy' or 'Unaka' Mountain, between the Indian towns Cowee and Old Chota." The part of the great mountain range called "Smoky Mountain" is well known, as is also that part of the same range southwest of Smoky Mountain called "Unicoy" or "Unaka" Mountain. There is no trouble about the location of these two great natural monuments in the line. The distance between the two is not less than 50 miles, and the only call which is locative of the line between the two is that the line is to run along "the extreme height of the said range, theretofore called the 'Great Iron' or 'Smoky' Mountain, to that part of the range or ridge called the 'Unicoy' or 'Unaka' Mountain." The commissioners representing the two states were not authorized to agree upon a new boundary, but to "settle, run, and re-

[1] This case was decided before Judge Taft resigned.

mark the boundary line * * * agreeably to the true intent and meaning" of the said cession act of 1789. It was clearly their duty to run and mark a line between the Great Smoky and Unaka Mountains "following the extreme height" of the mountain range connecting these two prominent points.

The line located by the commissioners, as shown by the two acts adopting it as the boundary between the two states, begins at a stone set up on the north side of Cataloochee turnpike, and properly marked. The course of the line from that stone for a distance of 101 miles is "southwestwardly," as repeatedly stated in the boundary acts referred to. From the Cataloochee stone the call is to run southwestwardly "to the Bald Rock on the summit of the Great Iron or Smoky Mountain," and continuing southwestwardly "on the extreme height thereof to where it strikes the Tennessee river, * * * crossing Tennessee river at the distance of sixty-five miles from the beginning." Between the Bald Rock and the Tennessee river several points on the line are called for, but we need not concern ourselves with them, inasmuch as the line to the Tennessee river is undisputed, and is not here involved. The point where the commissioners' line reaches the Tennessee river, now known as the "Little Tennessee River," is one of the fixed and settled questions on this record. The line on the northeast side of the river is well located, and a fore and aft state-line pine tree is standing very near the bank of the river, one-half mile below the point where Slick Rock creek empties into the river on the opposite side. The special master reports that this pine tree on the northeast bank of the river is a state-line tree, marked as a state-line fore and aft tree, the marks showing by annular lines that it was so marked in 1821. He also reports that the parties agreed before him that the line was well established to that tree. The controversy begins, then, at the point where the line reaches the Tennessee river at this well-established monument. The next point in the line as located by the commissioners, upon which all parties agree, is the point where two ridges make a junction southwest of the Tennessee river. One of these ridges is known as the "Hangover" and the other as the "Fodder Stack." This point of junction is about nine miles from the fore and aft pine tree on the northeast bank of the river. The disagreement is as to the true location of the commissioners' line between these two well-located points in the line. Returning to the line as located by the joint commission, we find the next call, after striking the Tennessee river, is in these words: "From Tennessee river to the main ridge and along the extreme height of the same to the place where it is called the 'Unicoy' or 'Unaka' Mountain." Just here it may be observed that the Unicoy or Unaka Mountain is about 15 miles in a southwesterly course from the junction of the two ridges spoken of heretofore. How did the commissioners locate the line between the Tennessee river and the Unaka Mountain? It is to be borne in mind that their authority was to "settle, run, and re-mark" the line "agreeably" to the cession act. The Tennessee river was a water course, which cut a deep gorge through the main mountain range which the line was following be-

tween the Smoky and the Unicoy Mountain. The cession act placed the boundary "along the extreme height of said mountain (that is, the Great Smoky) to the place where it is called 'Unicoy' or 'Unaka' Mountain." It was the duty of the commissioners to locate the line "agreeably" to this call. They had been following the extreme height of the ridge between the Smoky and the Tennessee river. The river cut through the ridge by a deep gorge, the mountain on either side gradually lowering, and terminating at the river in a bluff. The last monument on the northeastern side is a tree marked as a fore and aft tree. A fore and aft tree is a tree in the line, and the chops are on the sides showing the direction of the line. The chops on this tree indicated that the line there crossed the river. The general course of the line, as called for by the call which brought the line to the river, was southwesterly, and this course was to be continued to the Unaka. The course would, therefore, require the line to there cross the river, as also indicated by the chops on the tree. The general direction of the cession act would keep the line on the extreme height of the mountain ridge or range. Immediately across the river, and in the general course of the line, was the Hangover ridge. This ridge is joined by another ridge called the "Fodder Stack," some eight or ten miles southwest. Its height increases after it leaves the river, and the highest points between the river and the junction with the Fodder Stack are the Hangover and Hao peaks, the former having an altitude of about 4,500 feet. From the point where it is joined by the Fodder Stack ridge or spur, it is admittedly the main ridge, and further southwest becomes the Unicoy or Unaka. From the river the general course of Hangover is southwesterly, and therefore in the general course of the line as described in the cession act. One-half mile below the state-line fore and aft tree, a creek known as "Slick Rock Creek" empties into the river on the opposite side. That creek is some eight or ten miles in length, and has one or more branches. A short distance below its mouth a low spur approaches the river, called "Slick Rock Spur," being a spur of Fodder Stack ridge. Some seven miles up the creek another spur of Fodder Stack is found. The basin of the Slick Rock is about eight miles long and three miles wide. It is bounded on the south and southeast by the Hangover ridge, on the north and northwest by the Fodder Stack ridge, and on the north and northeast by the Tennessee river and the Slick Rock ridge. The mountains shutting it in are from 1,000 to 4,000 feet high, and the basin itself is a rough, broken mountain valley, almost impenetrable by man. The master reports that the Hangover ridge was the main or highest ridge, having an average height of 800 feet greater than the Fodder Stack.

It is admissible, in locating a line, where a difficulty exists in identifying monuments, natural or artificial, to run the line in a reverse way, if thereby doubts may be the better solved. "The footsteps of the original surveyor may be traced backward as well as forward." Ayers v. Watson, 137 U. S. 584, 590, 11 Sup. Ct. 201, 34 L. Ed. 803; Coal Co. v. Doran, 142 U. S. 417, 12 Sup. Ct. 239, 35 L. Ed. 1063. So any ascertained monument may be adopted as a starting point, where difficulty

exists in ascertaining the lines of a survey as actually run. Ayers v. Watson, 137 U. S. 584, 11 Sup. Ct. 201, 34 L. Ed. 803. We have two established points in the line as actually run by the state commissioners of 1821, between which points the disputed line exists. One point is the fore and aft tree on the northeastern side of the Tennessee river, and the other is some eight miles southwest from that tree, being the well marked line on the height of Hangover, where a junction is made with the Fodder Stack ridge. If we reverse the survey, and take this junction of the two ridges, or leads, as they are sometimes called, as a starting point in running backwards, one cannot doubt but that the line should follow Hangover to the river. The Fodder Stack ridge would not be observed by surveyors who had reached that point while following the highest ridge from Unicoy or Unaka, for it branches off several hundred feet below the crest of the Hangover, and the fact that a spur was there could only be learned by going down the mountain from three to four hundred feet. To abandon the Hangover in running backwards would also involve a change in direction from northeast to north, and then northwest and then west, and the Tennessee river would not be reached at all but by again diverging and following one or other of two lateral spurs. This situation is most plainly shown by the map of appellees, adopted by the master, as correctly showing the general course of the ridges or leads at the locality in question. This map is here shown upon a much reduced scale.

If the joint commissioners obeyed the call to follow the highest mountain tops, and adhered to the course pointed out in the cession act, they undoubtedly located the line on the Hangover; and if we follow the line which they reported and adopted, whether we endeavor to track them backward or forward, we must conclude from the call for the "main ridge" and "along the extreme height thereof," in the act adopting their survey, that they did in fact locate the line on the Hangover between the river and the junction of the Hangover and the Fodder Stack. The Hangover is undoubtedly the "main ridge" called for in the survey made by the commissioners, and definitely locates the line, unless there appears such definite and positive evidence of another and different actual location of the line as to justify us in finding that the line as described and located by natural monuments is not in fact the line actually run and marked and adopted by the commissioners. Every presumption is that the commissioners obeyed the directions of the cession act, and so, also, every presumption is that the line as actually run, marked, and adopted was a line which conforms to the call to follow the extreme height of the "main ridge" from the Tennessee river to Unaka.

But appellants say that they have shown a well-marked line from the mouth of Slick Rock creek, which follows the meanders of that creek for about seven miles, and then runs up a spur of the Fodder Stack, and connects with that ridge at the peak called "Little Fodder Stack." The Fodder Stack ridge does not run to the Tennessee river at all. North of the peak called "Little Fodder Stack" its general course is to the northwest. It cannot, therefore, be regarded in any sense as the "main ridge" called for by the survey of the joint commission, irrespective of the fact already noticed that its average altitude

is about 800 feet less than that of the Hangover, which does start at the river immediately opposite the main ridge on the northeast side of the river, and upon which the line on that side is confessedly located. From the top of the Fodder Stack the appellants claim that the state line runs south with the summit of that ridge to its junction with the Hangover ridge, which from there runs southwest. To support this contention appellants rely upon the fact that between the mouth of Slick Rock and the junction of Hangover and Fodder Stack ridges they show 41 trees marked as state-line trees, and from this circumstance they contend that this was the line actually marked by the commissioners, and adopted by them as the line, and that the calls for course and the "main ridge" must yield to the actually marked

line. That the commissioners marked the line run by them is made clear by the existence of a marked line over those parts of the undisputed line on either side of the place in dispute. The North Carolina act of 1821, adopting and confirming the survey of the commission, concludes with the words, "the whole distinctly marked with two chops and a blaze on each fore and aft tree, and three chops on each side line tree." These words of description do not appear in the Tennessee act of 1821, and neither the original report of the commissioners nor the surveyors' field notes are in existence. The marked trees on this line are shown by blocking to have been probably made in 1821, and correspond in appearance to those existing in the undisputed line. They are strangely scattered along the line claimed. About one-half of the whole number are found within $1\frac{1}{4}$ miles of the mouth of the creek. Then for a distance of $3\frac{1}{2}$ miles not a marked tree is shown, though the line is still in the valley, where there was and is a great abundance of timber. Then, where the line is claimed to have left the creek, there are found a great number of marked trees within a short distance after starting up a spur leading to the Fodder Stack, but from the junction of this spur with the Fodder Stack to the Hangover only two or three trees are found. It is most difficult to account for this line of marked trees, irregularly as they are grouped. The probabilities are that they were marked by the commission. For what purpose? is the question. Their evidential value as establishing the actual state line is greatly impaired by the following circumstances: (1) The line thus marked is not upon the course which is called for by the survey as reported and adopted. (2) It departs from the line of the "main ridge," called for in the commissioners' survey, and a natural monument of the utmost significance. When a monument, natural or artificial, is called for, and its identity is doubtful, great importance may be properly attached to an actually marked line upon the ground. But in this instance there was no reasonable doubt as to the identity of the "main ridge" called for in the commissioners' survey. The greater altitude of the Hangover ridge, as well as its general course, makes it most clear that there could have been no difficulty in determining that the Hangover, and not the Fodder Stack, was the "main ridge." It is, therefore, not a case of ambiguous calls, or doubt as to the identity of a natural monument in the description. The indisputable facts that the Hangover is much the greater in elevation, was in the direct course called for by the cession act, and was indicated by the chops on the established monument on the north side of the river, leave no reason for supposing that the commission mistook the Fodder Stack ridge as the "main ridge," and undertook to reach it by a line up the creek. (3) If we adopt the Slick Rock creek line, we must believe that the commissioners not only turned down the river at an acute angle from the course they had been following, followed the river for half a mile, and yet made no call in their report which would indicate such a departure, or that the river was made the boundary for any part of the line. (4) We must also believe that, instead of following a mountain boundary, which, according to the cession act, ran with the summits of the highest mountains, they deliberately abandoned the heights of the mountain ranges, and followed

a water course from its mouth for seven miles, and yet made no mention of this natural object in their report whatever. (5) The significance of these trees as marking the state line is also affected by the fact that other trees similarly marked are found on the Fodder Stack ridge, which, confessedly, are not upon any line now claimed as the actually located state line. The surveyors who testify to such trees express the opinion that they were marked to designate Indian trails. As this whole region was the habitat of the Cherokee Indians at the time of this survey, in 1821, it is altogether possible that all of this marking was done by the Indians as mere trail marks, or in a spirit of imitation, though the stronger probability is that it was tentatively marked, and then abandoned for the Hangover line, as the one indicated by the cession act, and the report made accordingly. (6) But the significance of the marked trees on the Slick Rock creek line is also weakened greatly by the fact that two, and possibly three, old marked state-line trees are found on the Hangover line. One of these trees is a black or red oak, and the other a sourwood. These trees stand on the summit of the Hangover ridge. The question as to whether they bore the proper marks for state-line trees marked in 1821 was much controverted. The master, after seeing and hearing most of the witnesses, and weighing the evidence, and seeing the blocks cut from the oak, reached the conclusion that the marks were state-line marks made in 1821, and so reported. In this conclusion the learned trial judge concurred. Giving to the finding of the master the weight properly attachable to it by the well-settled rule in that regard, we are unable to see any solid ground for rejecting his conclusion that these disputed trees are state-line trees, and marked as such in 1821 by the state commission. Kimberly v. Armes, 129 U. S. 512, 9 Sup. Ct. 355, 32 L. Ed. 764; Medsker v. Bonebroke, 108 U. S. 66, 2 Sup. Ct. 351, 27 L. Ed. 654; Davis v. Schwartz, 155 U. S. 631, 15 Sup. Ct. 237, 39 L. Ed. 289; Singleton v. Felton (decided at this term by this court) 101 Fed. 526. We have, then, two lines run and marked. One is the better marked, possibly because it passed through more timber, and timber better adapted to carry the marks than the other, which followed a rocky, barren, mountain ridge, where the trees, as shown by the evidence, were scrubby and scarce. The other line, though more scantily marked, is found just where the course and natural monuments called for in the report of the survey would locate the line if neither had been marked. That the line ought to run on the extreme height of the Hangover ridge from the Tennessee river to the Unaka mountain, if the calls of the confirmatory boundary acts of both states are to control, is most evident.

The order of applying descriptions of boundaries is first to natural objects, course, and distances. In Brown v. Huger, 21 How. 306, 318, 16 L. Ed. 125, 129, the court said:

"In ascertaining the boundaries of surveys or patents, the universal rule is this: that whenever natural or permanent objects are embraced in the calls of either, these have absolute control, and both course and distance must yield to their influences."

In Newson v. Pryor, 7 Wheat. 10, 5 L. Ed. 382, it was laid down as a rule that the most material and certain calls must control

those that are less certain and material. The rule in Tennessee is not different. A call for a natural object will control unless it is shown that monuments of boundary were made at the time of the execution of the deed, and adopted as the boundary. Massengill v. Boyles, 4 Humph. 206. In Bishop's Lessee v. Arnold, Peck, 366, Haywood, J., said:

"When the consideration of questions of boundary first came before the courts in North Carolina, it was with difficulty the courts could bring themselves to depart from the calls of the grant, under the rule of evidence that parol proof should not be received to add to or detract from a written instrument, and the law to this day is, if the grant is intelligible on its face, it must not be departed from; but, many mistakes having intervened in making surveys, plats, and certificates, and filling the calls in grants, it was at length permitted to show the mistake by proofs."

The description of the boundary as run and marked by the commissioners calls for a course from one natural object, the Tennessee river, to another, the Unaka Mountain. In the absence of any further description, the line should be run straight from one monument to the other. 3 Washb. Real Prop. side p. 632; Burnett v. Jones, 51 N. C. 210; Jenks v. Morgan, 6 Gray, 448; Caraway v. Chancey, 51 N. C. 364. The first call in the boundary act of both states is "from the Tennessee river to the main ridge." There are no words of intermediate description. The line should, therefore, be a straight one from the last monument on the river, the fore and aft pine tree, to the "main ridge." There being no possible doubt as to the identity of the "main ridge" referred to, there can be no doubt on the face of the description following that the line should then run "along the extreme height of the same" to the next natural monument, to wit, "to the place where it is called the 'Unicoy' or 'Unaka' Mountain." Finding, as we do, upon the line thus located by identified natural objects, two old state-line marked trees, marked, as shown by blocking and examining the annular growth, in 1821, we have no difficulty in agreeing that the line, as run and marked by the commissioners in 1821 was the Hangover line, as found by the special master, and as claimed by the appellees. The probabilities are that the surveyors tentatively or experimentally marked the line up Slick Rock creek. Discovering that thereby they made a radical departure from the "extreme height" of the mountain chain called for by the cession act of 1789, they abandoned the creek, and ran, adopted, and reported the line as running along the extreme height of the "main ridge," now known as "Hangover Ridge." This is the only reasonable explanation consistent with the absence of descriptive words calling for a line running down the Tennessee river, and then up Slick Rock creek. But it is insisted that the Slick Rock creek line has been long recognized as the line by both North Carolina and Tennessee, and by reputation and adoption has come to be the actual line, though not originally so run and marked. In the case of Virginia v. Tennessee, 148 U. S. 503, 522, 13 Sup. Ct. 728, 37 L. Ed. 537, where the question was a disputed boundary between Virginia and Tennessee, the court said:

"Independently of any effect due to the compact as such, a boundary line between the states and provinces, as between private persons, which has been run out, located, and marked upon the earth, and afterwards recognized and acquiesced in by the parties for a long course of years, is conclusive, even if it be ascertained that it varies somewhat from the course given in the original grant; and the line so established takes effect, not as an alienation of territory, but as a definition of the true and ancient boundary."

But the court was there considering the effect of acquiescence upon a line run and marked by the commission of each state, which had been long recognized by both states as the true line, though, in fact, as afterwards discovered, it departed from the line called for in the grant which ought to have been pursued. That is not this case. Upon the facts stated, the Hangover line was run, marked, and adopted by the commissioners as the line called for and described in the cession act. From 1821 down to 1836 there is nothing in this record tending to show that either state, nor any persons, were claiming or recognizing the experimental line on Slick Rock creek as the line. The tentative line on the creek seems to have been first treated as the state line as late as in the fall of 1836, when the Tennessee surveyor general stopped a survey of the Cherokee lands ceded to Tennessee in that year, and which included the disputed strip at Slick Rock creek. Evidence as to the reputation of the creek line of trees as marking the state line, and of other acts indicating a recognition of that line as the actual line, must be unavailing, unless it is persuasive enough to satisfy the legal mind that the state commissioners ran, marked, and adopted the Slick Rock creek line as the true line, although it is a radical departure from the description in the cession act, and contradicted by the description they themselves reported of the line they had run and adopted; or such evidence must show such a long and continuous recognition by both states of the creek line as to operate as an estoppel to deny that it was the line run and marked and adopted in 1821. Let us look at the evidence which is to be strong enough to pull the line away from the location indicated by the natural and definite monuments described in the survey. The matters chiefly relied upon by appellants are these:

(1) In 1836 the Cherokee Indians ceded to the United States their lands lying in both North Carolina and Tennessee, and the United States ceded to Tennessee the lands so acquired within that state. The Tennessee legislature, October 18, 1836, passed an act constituting said lands a surveyor's district, to be known as the "Ocoee District," and directed the surveyor general of the state to survey said lands, and plat them off into ranges, townships, and sections. The surveyor general accordingly did survey and plat said lands, and the plat shows that he stopped his survey at Slick Rock creek, and made that the eastern boundary of the Ocoee district. This resulted in leaving unsurveyed a strip of the Cherokee lands lying between the creek and Hangover, some three miles wide and six miles long, and is the land now in dispute. Until 1854 there was no law under which the unplatted Ocoee lands could be granted. But in 1854 an act was passed providing for the entering and granting of lands in the Ocoee district, "whether the same appeared on

the map of the district or not." Acts Tenn. 1854, c. 22. The defendants below, by authority of this act, entered the lands now in controversy in 1882, and carried them into a grant in 1892.

(2) A direct consequence of the omission of the surveyor general to survey and plat the land east of the creek was to give rise to the reputation of the creek as the state line, although it is not so shown by his plat, nor by any report made by him. The fractional sections in the Ocoee district bounded on the creek were granted by Tennessee as fractional sections, though none of the grants call for the creek as the state line. The subsequent deeds of the grantees do frequently refer to the creek as the state line, though none of these fractional sections appear to have been conveyed by deeds so describing the creek earlier than 1853.

(3) In 1837, North Carolina made provision for the sale of the lands acquired by her through the Cherokee cession, but no surveys or grants within the disputed lines were made by that state before 1853. Two entries of land appear to have been made under North Carolina entries in 1853, another in 1859, and in 1860 grant No. 2,784, for 14,800 acres, was issued to Gilbert and Peet, under an entry made in 1853, and surveyed in 1856, under which grant the appellants claim.

(4) To further support the claim that the creek has been recognized as the state line, the defendants sought to prove by one Jones certain declarations made to him by one Thos. Hensley, deceased, that he (Hensley) had been with the surveyor general's party a part of the time when the Ocoee district was surveyed, and that Hensley said the survey was stopped at the creek because it was the state line. This was rejected. Hensley's connection with the party of the surveyors was not shown, and his declaration amounted to nothing more than the statement of his opinion on the subject. As the declaration of a deceased person touching the location of a disputed boundary, it was possibly competent, under the Tennessee decisions holding that the declarations of deceased persons as to the location of a boundary line of land, made previous to the litigation, are competent. Beard v. Talbot, Cooke, 142; Holland v. Overton, 4 Yerg. 486; McCloud v. Mynatt, 2 Cold. 163. In a suit involving land titles, the courts of the United States follow state decisions upon questions of evidence. Clement v. Packer, 125 U. S. 309, 8 Sup. Ct. 907, 31 L. Ed. 721; Ayers v. Watson, 137 U. S. 584, 596, 11 Sup. Ct. 201, 34 L. Ed. 803. There was admitted in evidence, under the rule stated above, evidence as to the declarations of several deceased persons, some of whom claimed to have been with the state commission of 1821, as to their understanding of the location of the line on Slick Rock creek. There was conflicting evidence locating the line by reputation. There was little in all this of any moment. The line at the point ran through an uninhabited wilderness, almost inaccessible. The fact of a visible line of marked trees on Slick Rock creek, observed by a few adventurous hunters, would naturally start the tradition that the state line was on the creek. The same fact doubtless influenced the surveyor general, and his omission to plat the lands east of the creek would con-

firm the reputation of that line. Not more than a half dozen persons are shown to have ever lived within the disputed lines, and there is a conflict as to whether they regarded themselves as living in Tennessee or North Carolina until after 1882, when they, or the greater number, being mere squatters, began to hold under one or other of the contending titles, and to locate the line to suit their landlords. None of them go back beyond the North Carolina grant under which appellants claim, which bears date in 1860. Since 1882, when appellees obtained their grant from Tennessee, most of these inhabitants, if not all, have attorned to appellees, and have since voted in Tennessee, and hold themselves out as citizens of the Seventeenth civil district of Monroe county, Tenn. No active exercise of jurisdiction over the disputed territory is shown by either state, aside from the issuances of entries or grants to any who chose to apply. As the greater part of their large grant is indisputably in North Carolina, the appellants have paid taxes on the whole in that state. The fact is that the locus in quo is so inaccessible, so worthless for agricultural purposes, and so uninhabited, as to make the active exertion of jurisdiction by either state of no consequence. The land is now supposed to be valuable for timber and mining purposes, hence the present suit.

To sum up the case:

1. The calls of the cession act of 1789, if followed, would locate the line on the Hangover ridge.

2. The legislation of both states, providing for the survey and marking of the line, required the commissioners to locate the line described by the cession act.

3. The calls of the confirmatory acts of 1821 of both states, if followed, locate the line on Hangover.

4. The commissioners did run and mark a line on Hangover, and two state-line trees are identified and established as state-line trees on that ridge.

5. The commissioners also ran and marked a line along Slick Rock creek, which connects ultimately with the Hangover line at the junction of the Fodder Stack with Hangover.

6. Between 1821 and 1836 the disputed strip between these lines was a part of the land occupied by the Cherokee Indians, who in that year ceded their land to the United States; the Cherokee lands on the North Carolina side being subsequently ceded to North Carolina, and those within Tennessee to the latter state.

7. Between 1836 and 1853 the disputed region was an uninhabited wilderness, and neither state actively asserted any jurisdiction.

8. In 1836, Tennessee caused the Cherokee lands ceded to her to be laid off into a land district called the "Ocoee District." The surveyor general omitted to plat or survey the lands between the marked line on Slick Rock creek and Hangover, and bounded his survey by Slick Rock creek.

9. Between 1853 and 1882 grantees under Tennessee, in conveying fractional sections within the Ocoee district, described Slick Rock creek as the state line.

103 F.—35

10. After the Ocoee survey, in 1836, and down to 1882, the marked line on Slick Rock creek was reputed to be the state line.

11. Between 1853 and 1860 North Carolina entries and grants were made between the two lines.

12. In 1854, Tennessee, by law, provided for the entering and granting of lands in the Ocoee district, whether platted and surveyed or not, though the act did not assert that there were such unsurveyed lands.

13. In 1882 the entries under which the complainants claim, or a part of them, were made within the disputed lines, and in 1892 the complainants' grantors obtained a grant.

14. After 1882 there was a divided opinion and reputation as to the location of the state line, and since that time the few inhabitants have voted and paid taxes in Tennessee, though the appellants have paid taxes on their grant in North Carolina.

15. The region remains almost uninhabited and inaccessible. Neither state is shown to have exercised jurisdiction over it save by issuing entries and grants as stated.

16. The true line, as actually located in 1821, was the Hangover line.

17. There has been, on the evidence in this record, no such long and continued recognition or acquiescence in the tentative line on Slick Rock creek as to justify this court in saying that it has been adopted as the actual line so long as to stand for a definition of the true and ancient boundary. The conclusions and findings of the master upon the principal points in the case are not shown to have been so plainly erroneous as to justify us in overturning his conclusions as to the existence of the marked state-line trees on the Hangover, nor as to the fact that the Hangover was palpably the "main ridge" called for in the commissioners' report and survey.

The case, on the whole, is one not free from doubts engendered by the existence of the marked line on Slick Rock creek and its apparent recognition by the Tennessee surveyor general as the state line. The result reached by the special master, and confirmed by a most careful and conscientious trial judge, is a result which on the whole is most consonant with the calls in the cession act and the subsequent confirmatory boundary acts. The evidence relied upon to deflect the boundary from the line so plainly described by both acts settling the boundary is not so conclusive as to require us to reverse the action of the circuit court. The decree will therefore be affirmed.