### STEVENSON et al. v. FAIN et al.

(Circuit Court of Appeals, Sixth Circuit. May 6, 1902.)

#### No. 987.

1. STATE BOUNDARIES—LINE BETWEEN NORTH CAROLINA AND TENNESSEE.

Under the acts of 1821 of the states of North Carolina and Tennessee confirming the boundary line between the two states "as run and marked" by the joint commission, when it is clearly shown where the line between two known points but a few miles apart was run and

marked by the commission, such line must be accepted by the courts, in a suit between private persons, as the true and ancient boundary, even though it now appears that a different line between such points might more accurately conform to a general call in the act of cession for "the extreme height" of a certain mountain for a distance of 100 miles.

**2. SAME.**

In that part of the boundary line between North Carolina and Tennessee described in the confirmatory acts of the two states as running "from Tennessee river to the main ridge and along the extreme height of the same to the place where it is called the 'Unicoy' or 'Unaka' Mountain," the boundary between the two known points called "County Corner" and "Gold Bryson Gap" follows the line run and marked by the joint commission along what is known as "State Ridge."

Appeal from the Circuit Court of the United States for the Eastern District of Tennessee.

This is a bill to remove a cloud upon the title to a body of wild mountain lands, including about 10,000 acres, lying adjacent to the boundary between Tennessee and North Carolina. The complainants claim title to the lands under grants from the state of Tennessee and mesne conveyances to them, and aver that they are in possession, and that said lands lie wholly in Monroe county, Tenn. They charge that the same lands are claimed by the defendants as heirs at law of one M. Fain, who claimed same under grants from the state of North Carolina. The object of the bill is to obtain the cancellation of these grants as a cloud upon complainants' title, and for this purpose they aver that the lands so claimed and granted were not within the state of North Carolina, nor subject to grant by that state. The defendants disclaim title to any lands in Monroe county, Tenn., and aver that the lands in controversy lie wholly within the county of Cherokee, state of North Carolina, and that they were lawfully granted to their ancestor by said state. The issue, therefore, involves the question of the true boundary between North Carolina and Tennessee, and the decree must be for the complainants if it shall appear that the lands lie within the state of Tennessee. Tennessee originally constituted the western part of the state of North Carolina. The cession act of 1789, ceding the territory now constituting the state of Tennessee to the United States, describes the eastern boundary line as follows: "Beginning on the extreme height of the Stone Mountain, at the place where the Virginia line intersects it, running thence along the extreme height of the said mountain to the place where the Wautauga river breaks through it; thence a direct course to the top of the Yellow Mountain, where Bright's road crosses same; thence along the ridge of said mountain, between the waters of Doe river and the waters of Rock creek, to the place where the road crosses the Iron Mountain; from thence along the extreme height of said mountain to where Nolinchucky river runs through the same; thence to the top of the Bald Mountain; thence along the extreme height of the said mountain to the Painted Rock, on French Broad river; thence along the highest ridge of the said mountain to the place where it is called the 'Great Iron' or 'Smoky' Mountain; thence along the extreme height of the said mountain to the place where it is called 'Unicoy' or 'Unaka' Mountain, between the Indian towns Cowee and Old Chota; thence along the main ridge of the said mountain to the southern boundary of this state." The line here to be ascertained is included within the call beginning: "Thence along the extreme height of the said mountain to the place where it is called 'Unicoy' or 'Unaka' Mountain, between the Indian towns Cowee and Old Chota." The ascertainment of the "main ridge" of the "Great Iron" or "Smoky" Mountain, and the location of the boundary line along its "extreme height," became at an early day a matter of importance to both states. To the end that the line thus indicated should be settled, run, and marked, acts were passed in 1821 by both states, providing for a joint commission to ascertain, run, and mark the line of the cession act. These acts were in substantially identical terms, and required the commissioners "to

settle, run and re-mark the boundary line" between the two states, agreeably to the true intent and meaning of the said act of the general assembly of North Carolina, entitled "An act for the purpose of ceding to the United States of America certain western lands therein described." Acts Tenn. 1820, c. 22; 2 Ired. & B. Rev. St. N. O. p. 94. The said commissioners did accordingly run and mark said line, and each state passed an act ratifying, confirming, and adopting the line as run, marked, and reported by the joint commission. Acts Tenn. 1821, p. 45, c. 35; 2 Ired. & B. Rev. St. N. C. p. 96. The Tennessee act ratifying and adopting said line so ascertained, run, and marked is as follows: "Be it enacted by the general assembly of the state of Tennessee that the dividing line run and marked by Alexander Smith, Isaac Allen and Simeon Perry, commissioners for and on behalf of this state, and James Mebane, Montfort Stokes and Robert Love, commissioners for and on behalf of the state of North Carolina, which dividing line, as run by said commissioners, begins at a stone set up on the north side of Cataloochee turnpike road, and marked on the west side, 'Tenn. 1821,' and on the east side, 'N. C. 1821;' running thence on a southwestwardly course to the Bald Rock, on the summit of the Great Iron or Smoky Mountain, and continuing southwestwardly on the extreme height thereof to where it strikes Tennessee river, about seven miles above the old Indian town of Tallassee, crossing Porter's Gap at the distance of twenty-two miles from the beginning, passing Meigs boundary line at thirty-one and a half miles, the Equovettly path at fifty-three miles, and crossing Tennessee river at the distance of sixty-five miles from the beginning; from Tennessee river to the main ridge, and along the extreme height of the same to the place where it is called the 'Unicoy' or 'Unaka' Mountain, striking the old trading path leading from the valley towns to the overhills towns, near the head of the west fork of Tellico river, and at the distance of ninety-three miles from the beginning; thence along the extreme height of the Unicoy or Unaka Mountain to the southwest end thereof, at the Unicoy or Unaka turnpike road, where a corner stone is set up marked 'Ten.' on the west side and 'N. C.' on the east side, and where a hickory tree is also marked on the south side 'Ten. 101 M.' and on the north side 'N. C. 101 M.' being one hundred and one miles from the beginning; from thence a due course south two miles and two-hundred and fifty-two poles to a spruce pine on the north bank of the Hiwassee river, below the mouth of Cane creek; thence up the said river the same course about one mile, and crossing the same to a maple marked 'W. D.' and 'R. A.' on the south bank of the river; thence continuing the same course due south eleven miles and two hundred and seventy-three poles to the southern boundary line of the state of Tennessee and North Carolina, making in all one hundred and sixteen miles and two hundred and twenty-three poles from the beginning, and striking the southern boundary line twenty-three poles west of a tree in said line marked '72 M.' where was set up by said commissioners a square post, marked on the west side 'Ten. 1821' and on the east side 'N. C. 1821' and on the south side 'G,' be, and the same is hereby ratified, confirmed and established as the true boundary line between this state and North Carolina." The confirmatory North Carolina act is in identical words, but concludes with these words: "The whole distinctly marked with two chops and a blaze on each fore and aft tree, and three chops on each side line, and mile marked at the end of each mile." That part of the boundary line here involved is included within the line described in the ratifying acts as follows: "From Tennessee river to the main ridge, and along the extreme height of the same to the place where it is called the 'Unicoy' or 'Unaka' Mountain." This line from the Tennessee river southwest along the "main ridge" to the Unaka Mountain is perfectly well marked and settled, except between two well-known points in the line called "County Corners" and "Gold Brysons Gap." The distance between these two known points in the settled line is from six to twelve miles, being six miles if run along the ridge between the two points known as the "State Ridge," or twelve miles if run along the crests of a series of broken ridges, lying more to the southeast. The shorter or State Ridge line is the line claimed by the defendants, and the longer line the one claimed by the complainants. The small plat made

from the map drawn by W. D. Hale, one of the surveyors, here following, indicates in a general way the two lines contended for. The longer or red line [1] is the line urged by complainants, and, if established, throws the land in controversy on the Tennessee side of the line. The shorter or State Ridge line is the line set up by the defendants, and, if the true line, establishes their title under the North Carolina grants to M. Fain. Upon the pleadings and a large volume of proof the court below found that the lands were situated wholly within the state of North Carolina, and were, therefore, not subject to grant by the state of Tennessee.

The dotted line is the red line referred to in the opinion, and the heavy line is the black line referred to.

Charles Seymour, for appellants.

Samuel G. Shields, for appellees.

Before LURTON, DAY, and SEVERENS, Circuit Judges.

LURTON, Circuit Judge, after making the foregoing statement of the case, delivered the opinion of the court.

That the line claimed by the defendants along what is called the crest of the State Ridge, being the black line [2] between County Corners and Gold Brysons Gap, as shown on the plat heretofore set out, was the line actually run and marked by the joint commission as the dividing line between the two states is established by the great weight

---

[1] The dotted line in the plat.      [2] The heavy line in the plat.

of evidence in this record. The evidence upon which this fact rests may be briefly summed up thus:

First. Along the State Ridge line are found a number of state-line trees bearing the state-line marks of two chops and a blaze for fore and aft trees and three chops on each side for side line trees. By "blocking," the annular rings of tree growth show to a demonstration that these trees were marked in 1821.

Second. No such marked line, nor a single marked tree, is shown upon the red or longer line claimed by appellants.

Third. The North Carolina act of 1821, adopting and ratifying the line so run and marked, recites that the line was "mile marked at the end of each mile." 2 Ired. & B. Rev. St. N. C. 96; Belding v. Hebard, 43 C. C. A. 296, 299, 103 Fed. 532. An ancient holly tree, marked "86 m.," was found along this State Ridge line, which, by blocking, is shown to have been marked in 1821, and to be 86 miles from the beginning.

Fourth. The distance between "County Corners" and "Gold Brysons Gap," well-settled points in the boundary line, is 6 miles by the marked line following the State Ridge, and 12 miles if the red line of broken ridges be followed, as claimed by appellants. The distance from the beginning point named in the act of 1821 at the Cataloochee turnpike, to a stone set and marked where the line reaches the Unaka turnpike is 101 miles, and by actual survey following the line marked on the ground this distance is shown to be only 101½ miles if the State Ridge line be followed at the disputed place in the line, while the actual distance is increased to something more than 107 miles if the line claimed by appellant is adopted; the whole gain being between the undisputed points in the conceded line, "County Corners" and "Gold Brysons Gap."

Fifth. Tradition concurs with the other evidence in establishing the line run as the line along State Ridge, for that ridge has been always known as the "State Ridge."

Sixth. The course of the line given in both the cession acts and the confirmatory acts of 1821 is southwestwardly, and this course is that pursued by the State Ridge line, while to pursue the other line would require a sharp departure from such general course, and the adoption of a southeasterly course for several miles, then a southerly course, then a westerly course, until the well-marked line at "Gold Brysons Gap" is reached again.

Against this evidence establishing the State Ridge line as the line run and marked as the dividing line the appellants say:

First. That the evidence shows that the joint commission ran and marked the State Ridge line by mistake, supposing it to be the main ridge line. That before reporting their survey they discovered their mistake, and abandoned the State Ridge line, and adopted the longer main ridge line, and reported such line by the description in the confirmatory act calling for a line indicated by natural monuments, to wit, the extreme height of the main ridge.

Second. That the line they contend for has been claimed as the line by Tennessee, and that she has from an early date exercised jurisdiction up to that line.

Taking these positions in their order, it may be conceded that the average elevation of the ridge claimed by appellants is greater than the average elevation of the State. Ridge and of Jenks Ridge, which also constitutes a part of the line followed by the line called the "State Ridge" line. The claim to be a "ridge" at all is, however, more questionable. It consists in a succession of high peaks and low depressions called gaps by the surveyors, and is lacking in that continuity which, to a much larger degree, constitutes the main ridge theretofore pursued by the marked boundary line. This broken ridge seems to be lacking in any obvious connection with the ridge departed from at "County Corners." The ridge upon which the dividing line is located at that point continues in a southwestwardly course until it gradually descends to Tellico river. Crossing Tellico a spur is ascended which leads onto Jenks Ridge at Gold Brysons Gap, where the admitted marked line is again picked up. There is nothing noticeable at County Corners or any other point within a mile on the State Ridge line which would lead an observer to suspect that the succession of ridges now claimed to be the extreme height of the main ridge was in fact the main ridge theretofore pursued. To take the proposed line an abrupt descent of about 500 feet must be made down the side of the State Ridge, when "Mitchell Licks" is reached, a flat about one-fourth of a mile wide. Then a sharp high peak is to be ascended and descended to another gap, and a succession of such peaks and depressions is encountered, until finally Jenks Ridge is ascended and the conceded line picked up. The departure from course is marked for at "County Corners," the main ridge is left, and a southeasterly course taken for about four miles, then a southerly course, then a westerly, until back on the marked line. Although the average elevation of the line of peaks and gaps claimed to constitute the "main ridge" called for is greater than the average elevation of the State Ridge, yet this is evidently due to the greater number of high peaks over which the line is supposed to go, and not to the elevation from which the peaks arise. Still if the absence or presence of the highest peaks is of significance in determining what is meant by the main ridge, it is to be observed that Grassy Knob, a high peak arising from the State Ridge, seems to be higher on the evidence in this record than any single peak in the other line. The objection that the State Ridge terminates at Tellico river, and that another ridge, cal'ed "Jenks Knob," is ascended and followed, is not appreciated. The distinct mass called State Ridge may be said to terminate by a gradual descent to the gap through which the Tellico breaks through. Nevertheless the State Ridge and the ridge which is ascended after crossing Tellico seem to constitute parts of what, for 100 miles, may be properly regarded as the "main ridge" of the Great Smoky Mountains. It is no more just to say that the State Ridge is terminated by the Tellico Gap than to say that every deep gap in the opposing line constitutes the termination of a ridge. The elevation of the depression through which the Tellico runs is not shown, nor have we the elevation of the many gaps in the other line. The depression of the main ridge through which Tellico finds its way is as much entitled to be regarded as a gap in that ridge as Mitchells Flat, a gap in the other ridge.

The field notes of the commissioners and their report of survey are not in existence. Whether they noted the crossing of the Tellico we have no way of knowing. It is not noticed in the confirmatory acts. But the river, where crossed, is little more than a creek, and the stream short and of little significance. It is doubtful whether the commissioners realized that the small stream crossed was the Tellico. At most, the fact that the confirmatory acts do not call for the stream is of no great significance, in view of the almost undisputed fact that the line crossing the Tellico was the line actually run and marked as the dividing line. The evidence relied upon to show that the State Ridge marked line was abandoned by the commissioners after being run and marked is not of weight. It consists in evidence of declarations made by deceased persons many years since, that the surveyors abandoned the State Ridge line on discovering that it was not so high as the line now set up, and that the declarants said that the commission directed that the state-line marks on that ridge should be defaced, and the other line marked. The declarants were neither commissioners nor surveyors, being only subordinates, so far as appears, and engaged in manual labor. Aside from the intrinsic weakness of all such hearsay evidence, the declarations here proven are practically worthless, because no defaced marks are shown on the State Ridge line, and no state-line marks of any kind are proven to exist, or to have ever existed, on the line ordered to be marked. Neither do the declarants say that that line was ever in fact run or ever marked. That this line of broken ridges constitutes the dividing line at this point between the waters which run south into North Carolina and north into Tennessee seems to be established. But neither the cession act nor the confirmatory boundary act call for the water "divide" as a natural boundary. The "main ridge" which is designated as a natural monument may very well be cut by waters rising in North Carolina or Tennessee without making it any the less the "main ridge" of the Smoky Mountain. That this is the case in reference to the Tennessee river we can know from this record.

The contention of the learned counsel for the appellants is that a call for a natural monument in a boundary must control all other calls, and that the call in the cession act for "then along the extreme height" of the Smoky Mountain is a call which cannot be departed from. The general principle may be conceded. But the line thus described was a line about 100 miles in length. The Great Iron, or Smoky, Mountain is not a single high peak, but a great bed of mountains, consisting of ridges, spurs, high peaks, deep gaps, and wide valleys.

The necessity for a definite ascertainment and location of the line and its plain marking on the ground was essential to the orderly exercise of jurisdiction, and for the quieting of titles. This condition resulted in the joint commission, and each state, by the act appointing them, undertook to be bound by the action of a majority of the commission. The report of this commission has been lost, one of the consequences of the Civil War. But the acts passed by each state, adopted, ratified, and confirmed the "dividing line run and marked * * * which dividing line as run by the said commissioners, begins," etc  Acts Tenn. 1821, c. 35. That part of the line so "run and

marked" which includes the line here involved calls to cross the Tennessee river at sixty-five miles from the beginning point at the Cataloochee turnpike and continues as follows: "From Tennessee river to the main ridge, and along the extreme height of the same to the place where it is called the 'Unicoy' or 'Unaka' Mountain." The only descriptive call in this long line, a distance of not less than 25 miles, is along the "extreme height" of the "main ridge," meaning thereby "the main ridge" of that mountain range which we now know as the "Great Smoky Mountains." We are not prepared to say that this call would require in all cases that the line should run over the highest peaks of this great bed of mountains. The call is to run along the "extreme height" of the "main ridge." The controlling words are "main ridge," and qualify "extreme height." It is the "extreme heights" of that ridge which is the "main ridge" of the mountain range which is to be followed, and it by no means follows that that ridge which had a peak or peaks rising to the greatest altitude would be the "main ridge" called for. The general character of the ridge, having regard to its continuity, its direction, and its relation to other ridges or spurs, should be considered in determining whether it is an inferior or collateral ridge, or, indeed, the main backbone of the range. All these questions would plainly arise for adjustment in locating and marking a line described in such general terms.

On the evidence in this case we are not satisfied that the State Ridge, upon which the commission run and marked the dividing line, was not the "main ridge," within the fair meaning of that call of the ratification act. But the line confirmed, ratified, and adopted by the solemn legislation of each state was the dividing line "run and marked," and although the line so run and marked should now appear to have been located upon a ridge not so fully answering a call for the "extreme height" of the "main ridge," as the ridge further southeast, it would not justify this court, in a suit between private parties, in holding that the lines so "run and marked," and so adopted by both states, was not the dividing line between the states. The line run and marked by the commissioners was intended only to "mark and define that which actually existed before, but was undefined and unmarked." The running and marking of an ancient line would in no respect affect the relation of either state to the Union or to the other. The case, in its essential facts, is much like that of Virginia v. Tennessee, 148 U. S. 503, 13 Sup. Ct. 728, 37 L. Ed. 537, where the line between those states was involved. The evidence established that there had been a line run and marked by a joint commission and adopted by acts of each state. The contention was that the line so run and marked had departed from the line of 36° 30′, which was the ancient charter line, and that the acts adopting the line were invalid as compacts or agreements not consented to by the congress. After showing that such consent, if necessary to the mere ascertainment and marking of a boundary line, might be implied, the supreme court said:

"Independently of any effect due to the compact as such, a boundary line between states or provinces, as between private persons, which has been run out, located, and marked upon the earth, and afterwards recognized and acquiesced in by the parties for a long course of years, is conclusive.

even if it be ascertained that it varies somewhat from the courses given in the original grant; and the line so established takes effect, not as an alienation of territory, but as a definition of the true and ancient boundary."

In this aspect of the case we think the line "run and marked" in 1821 was, by the confirmatory acts of each state, recognized and accepted as a running and marking of a line which actually existed before, a mere ascertainment and definition of the ancient boundary, and to be given effect even if it be now shown, under a more accurate knowledge of the geography of the region, that the State Ridge was somewhat lower in average altitude than the more broken and difficult ridge constituting the watershed at this particular point.

But it is argued that Tennessee has for many years claimed and recognized the "water divide" ridge as the true eastern line of the state. The solemn act adopting and confirming the line run and marked by the joint commission has never been repealed or modified, and by no legislative action is it shown that the state of Tennessee has sought to deny the correctness of the line so run and marked by her commissioners. The acts relied upon to show a claim to the water divide line are separate acts of executive officers of the state, plainly done without intention to affect any boundary question.

The region through which the disputed line passed was, in 1821 and for many years afterwards, owned and occupied by the remnant of the great Cherokee tribe of Indians. In 1836 the Cherokee title was acquired to the Cherokee lands within the borders of Tennessee, and in that year those lands were constituted a surveyor's district, called "Ocoee District," and ordered to be surveyed and platted by the state surveyor general. In making his survey in 1836 that officer mistakenly included the lands in dispute within his survey, and they were platted and granted subsequently as a part of the acquired Cherokee lands. This erroneous platting made by this surveyor seems to be the source of all doubt in respect to this line, and is doubtless the origin of the error in the recent geodetic survey of this region shown by the official map published by the commission, which adopts the line claimed by the appellants.

The abortive Tennessee act of 1844, providing for the organization of the new county of Jones, is supposed by appellants to include the disputed lands within its boundary by the call "thence up the main south branch of said river (the Tellico) to the head, a distance of twenty-one miles to the North Carolina line, thence with the state line to the beginning." Laws 1843–44, p. 215. The head of the main south fork of the Tellico river is proven by one of appellants' witnesses to be "in the neighborhood of McDaniel's Bald," a lofty peak, over which the line urged by appellants passes. It is plain that if the eastern line stopped at the head of the south fork of Tellico it would not reach the North Carolina line, as claimed by appellants, which passes over the extreme height of McDaniel's Bald. The controlling call in the Jones county act would be the North Carolina line, for beyond that the state of Tennessee could not extend the new county, and nothing in the act indicates that the general assembly was in any way undertaking to claim jurisdiction beyond the well-known dividing line theretofore adopted.

The act of the state surveyor in surveying and platting the lands between the State Ridge and the water divide was not the act of the state. It was a plain mistake, made by an official having no authority to ascertain or run or mark the line dividing the states. True, the state granted the lands thus surveyed and platted. But this was not under legislative direction, nor is there anything to show that in thus granting these lands the executive department of the state intended to thereby intentionally claim jurisdiction beyond the old marked dividing line. Indeed, it does not appear that either the surveyor general or the executive department concerned in issuing grants for the lands erroneously surveyed ever knew that any part of the lands so surveyed or granted were south or east of the line run and marked in 1821. North Carolina did not have the Cherokee lands acquired by her surveyed until 1853. A part of the disputed lands was entered that year and subsequently carried into grants under which they are now held. The region is a wild and almost inaccessible mountain region, unfitted for agriculture, and valuable only for timber, difficult, if not impossible, to get out. The only inhabitants have been tenants of recent origin, claiming under one or other of the adverse claimants. No such acts of jurisdiction by either state are shown as to be of any importance in any aspect of the question.

In Belding v. Hebard, 43 C. C. A. 296, 103 Fed. 532, we had occasion to ascertain a portion of this dividing line, a few miles northeast of the part now in dispute. In that case we had evidence of two different lines, both probably run and marked by the joint commission. The line called the "Slick Creek" line was the better marked line, but was a plain departure from the call to follow the "main ridge." There was an old marked line on the "main ridge," and, though not so well marked, had the great advantage of being supported by the calls for course and the call for the extreme height of the "main ridge." Under the evidence, we held the latter to be the line "run and marked" by the commission of 1821, and adopted by the confirmatory acts of both states. In that case, as in this, we were confronted with the fact that the Tennessee Cherokee survey had stopped at the Slick Creek line, and in that way recognized that as the line. But upon the whole case we held that the evidence relied upon to pull the line away from the "extreme height" of the "main ridge" was insufficient. The marked difference between that case and this is, first, in the fact that the "main ridge" called for in the confirmatory acts of 1821 was far more clearly ascertained than in the present case; and, secondly, there was in that case evidence that two lines had been run and marked and old state-line marks shown on both lines. The call for the "main ridge" was, therefore, supplemented by the existence of artificial monuments, and this turned the scale over the other, although the more plainly marked line.

Upon the whole evidence we conclude that the line run and marked in 1821, and adopted by both North Carolina and Tennessee as a definition of the true and ancient dividing line, is the line located on the State Ridge, and the line in favor of which the court below held.

The decree dismissing the bill of complainants below must be affirmed.