IN THE

# SUPREME COURT OF TENNESSEE

FOR THE

## EASTERN DIVISION

KNOXVILLE, SEPTEMBER TERM, 1915.

MARY E. McCARTY *et al. v.* CAROLINA LUMBER COMPANY.

(*Knoxville.* September Term, 1915.)

1. **STATES. Boundaries. Establishment. Powers of court.**

The supreme court of the United States has, by the provisions of Const. U. S., article 3, section 2, original and exclusive jurisdiction to establish the boundaries between States, and such boundaries must be established either by its decree or by agreement of the States, so that courts of either State in an ejectment suit between citizens can determine only where the boundary is, and not what it should be. (*Post, pp.* 54-56.)

Acts cited and construed: Acts 1789, ch. 3; Acts 1796, ch. 18; Acts 1805, ch. 47; Acts 1820, ch. 22; Acts, 1832, p. 58; Acts 1881, ch. 347; Acts 1885, ch. 80.

Cases cited and approved: North Carolina v. State of Tennessee, 235 U. S., 1; Poole v. Fleeger, 11 Pet., 185; Rhode Island v. Massachusetts, 12 Pet., 657; Virginia v. Tenn., 148 U. S., 503.

Case cited and distinguished: Belding v. Hebard, 103 Fed., 523.

Constitution cited and construed: Art. 11, sec. 32; Art, 3, sec. 2.

McCarty v. Carolina Lumber Co.

2. **STATES. Boundaries. Establishment.**

The determination of the United States Geological Survey as to the boundary between States is not conclusive, since the survey was without authority to establish a line, and attempted only to represent the line as it was then thought to be located. (*Post, pp. 56, 57.*)

Cases cited and approved: Stevenson v. Fain, 116 Fed., 147; North Carolina v. Tennessee, 235 U. S., 1; Belding v. Hebard, 103 Fed., 523.

Case cited and distinguished: North Carolina v. Tennessee, 235 U. S., 1.

3. **STATES. Boundaries. Establishment. Validity.**

North Carolina commissioners of 1799 correctly interpreted the call of the Cession Act (Laws 1789, ch. 3), which read, "running from the end of Iron Mountain where the Nolachucky river runs through it, to the top of Bald Mountain," as requiring departure from the top of Iron Mountain at a point where both Little and Big Bald Mountains were visible, and running from there to Little Bald, and thence to and along the top of the range to Big Bald. (*Post, pp. 57-59.*)

4. **STATES. Boundaries. Establishment. Correction.**

Although commissioners in running a boundary between States should have run it in a certain way, other than that adopted, that question is immaterial in determining what the boundary is, since that is shown by their act, and not what their acts should have been. (*Post, p. 59.*)

5. **STATES. Boundaries. Establishment. Marking.**

Although the boundary as run by a boundary commission was not clearly marked by artificial marks, if the natural marks were clear the line was sufficiently established and would override the incorrectness of a line marked by trees or other artificial lines. (*Post, pp. 59, 60.*)

Case cited and approved: Ayres v. Watson, 113 U. S., 596.

McCarty v. Carolina Lumber Co.

6.  **STATES.  Boundaries.  Establishment.  Usage.**

The fact that inhabitants along the boundary between States sent their children to schools of one State and paid taxes to it is not conclusive of the proper location of the boundary, especially where the region was wild and inaccessible and they could only have employed the schools which they did employ.  (*Post, pp.* 60, 61.)

7.  **STATES.  Boundaries.  Establishment.**

Where North Carolina by its boundary commission of 1799 established the boundary between it and Tennessee, and Tennessee thereafter made but spasmodic attempts to have the line changed, each of which contemplated further action by North Carolina, which was not taken, the boundary originally established was the legal boundary.  (*Post, pp.* 61-63.)

Cases cited and approved:  Virginia v. Tennessee, 148 U. S., 503; Maryland v. West Virginia, 217 U. S., 1.

8.  **JUDGMENT.  Res judicata.  Persons concluded.**

Where the evidence was insufficient to show that the parties to a suit in ejectment involving the question of a State boundary were the parties to a prior suit in a federal court in another State, dismissed there on the ground of want of jurisdiction and the order of dismissal specifically provided that it should be without prejudice, the judgment was not *res judicata* and did not estop the parties in ejectment.  (*Post, pp.* 63-66.)

---

FROM UNICOI

---

Appeal from the Chancery Court of Unicoi County. —Hal. H. Haynes, Chancellor.

G. T. Lee and Susong & Biddle, for appellants.

POWELL, PRICE & SHELTON, A. S. HIGGINBOTHAM and E. FRANK WATSON, for appellee.

MR. TURNER, SPECIAL JUDGE, delivered the opinion of the Court.

This is an ejectment suit by the devisees of one N. B. McCarty brought November 17, 1911, by bill in chancery court in Unicoi county, Tennesee, against the defendant, Carolina Lumber Company, to recover a large boundary of mountain land alleged to be situated in Unicoi county, Tennessee, adjoining the line between the States of Tennessee and North Carolina; also to enjoin the defendant from committing acts of trespass and waste on said land. Service of process was made by a Tennessee officer upon an agent or employee of the defendant, and the defendant made a special appearance and filed two special pleas: First, denying the court's jurisdiction over the defendant, on the ground that process had been served by a Tennessee officer in the State of North Carolina; and second, denying the jurisdiction of the court over the subject-matter on the ground that the lands sued for are located, not in the State of Tennessee, but in the State of North Carolina. No issue is made upon the complainants' title. They have, however, deraigned title from certain Tennessee grants, with intermediate conveyances down to themselves. The sole issue in the case as now presented is one of fact, to wit, the true location of the State line between Tennessee and North Carolina fixing the boundary between the lands

of the complainants and the defendant. Each party contends for a different location of this line, the one claimed by complainants being referred to as the "water shed" line, running about a mile or more east of the line insisted on by the defendant, known as the line surveyed and located by the North Carolina com-missioners in 1799. Large volumes of evidence have been taken upon this issue, which has been thoroughly considered by the court, but it would be too tedious to recite all of its details in this opinon. Therefore we will content ourselves by stating the most material and controlling facts which are determinative of this issue.

The Act of 1789 (chapter 3) of North Carolina, ceding its western territory to the United States, the deed made pursuant thereto, and the constitution of Tennessee adopted in 1796 (article 11, section 32), upon which this western territory so ceded by North Carolina to the United States was admitted to the Union as the State of Tennessee, all agree in their descriptions of that boundary line between North Carolina and this ceded territory, now the State of Tennessee, as follows:

"Beginning on the extreme height of the Stone Mountain, at the place where the Virginia line intersects it, running thence along the extreme height of said mountain, to the place where Wautaugo river breaks through it; thence a direct course to the top of the Yellow Mountain where Bright's road crosses the same; thence along the ridge of said mountain between

the waters of Doe river and the waters of Rock creek, to the place where the road crosses the Iron Mountain, from thence along the extreme height of said mountain, to where the Nolachucky river runs through the same, thence to the top of the Bald Mountain; thence along the extreme height of the said mountain to the Painted Rock, on French Broad river; thence along the highest ridge of said mountain, to the place where it is called the Great Iron or Smoky Mountain; thence along the extreme height of the said mountain, to the place where it is called the Unicoy or Unaka Mountain, between the Indian towns of Cowee and Old Chota; thence along the main ridge of the said mountain, to the southern boundary of this State.''

The particular part or call of this boundary line involved in this case is the line from the top of Iron Mountain where the Nolachucky river runs through the same to the top of Bald Mountain.

In 1796, soon after the State of Tennessee was admitted to the Union, North Carolina passed an act (Laws 1796, chapter 18) providing for accurately and distinctly running, marking, and permanently establishing the boundary line between these States, and named Joseph McDowell, Mussendine Matthews, and David Vance as commissioners to meet commissioners to be appointed by the State of Tennessee for that purpose and directed them, in conjunction with said Tennessee commissioners, to fix and permanently establish the boundary line between the two States, and the same to mark and ascertain as distinctly as

possible agreeable. to the true intent and meaning of the Cession Act aforesaid, and to cause an accurate plot or plan of the boundary line to be made specifying courses, distances, natural and artificial marks, and return the same to the next general assembly to be preserved among the archives of the State. It was also directed that a copy of this act be certified to the governor of the State of Tennessee, with request that she appoint commissioners for a like purpose, and then provided that if it should so happen that the State of Tennessee should fail to appoint commissioners, or such commissioners after appointment should fail or refuse to act with the North Carolina commissioners, the latter were authorized, empowered, and required singly and by themselves to proceed to take all such measures as under the laws and constitution of the State and of the United States may be taken or had for effecting the purposes intended by this act. It further provided that the State of North Carolina would at all times ratify and be bound by the action of these commissioners. It does not appear that Tennessee took any action in this matter. On May 22, 1799, the North Carolina commissioners undertook the location of this boundary line, and on October 15, 1799, certified and reported their action to North Carolina. They did not run and locate the entire boundary line. They began at the Virginia line as directed, and ran the line to the top of a high pinnacle of the Smoky Mountain beyond the French Broad river, where they stopped. On December 30,

1802, Governor Roane of Tennessee by letter requested of Governor James Turner of North Carolina to certify for Tennessee's use, a copy of the report and plot of the North Carolina commissioners, showing the location and calls of this line. This request was complied with, and the secretary of state of North Carolina, on July 10, 1803, certified such a copy and it appears to have been transmitted to the governor of Tennessee and filed with her secretary of State. The copy of this report and map, appearing in this record, is certified from the Tennessee archives.

No act of the legislature of either State appears ratifying this action of the commissioners, but on November 4, 1805, the Tennessee legislature passed an act (Laws 1805, chapter 47), reciting that it was believed that the North Carolina commissioners in running said line had left the main Bald Mountain and took a ridge running westwardly to the lower Painted Rock on French Broad river, contrary to the true intent and meaning of the Cession Act, and appointing certain commissioners to meet commissioners of the State of North Carolina thereafter to be appointed to re-run or locate that part of the boundary line and directing a report of their action to be made to the next succeeding legislature. No action appears to to have been taken under this act either by North Carolina or by the Tennessee commissioners thereby appointed. The part of the line there indicated did not involve that part of the line now in dispute in this case.

In 1819, North Carolina passed an act authorizing the governor to appoint three commissioners to meet like commissoners to be appointed by the State of Tennessee to settle, and run and mark the boundary between the States agreeably to the true intent and meaning of the Cession Act and directing the governor to give notice thereof to the governor of the State of Tennessee, and request the appointment of commissioners on the part of that State, and by another section of the act it was provided that if for any reason Tennessee failed to appoint such commissoners or having appointed them, they should neglect or refuse to act, the commissioners appointed under that act on behalf of North Carolina were authorized and required to proceed in running and marking said line from the Smoky Mountains where the line terminated, which was run in 1799, under the direction of McDowell, Matthews, and Vance, commissioners, etc., and that said commissioners should cause an accurate plan of said boundary line to be made, specifying courses and distances, natural and artificial marks thereof, and return the same to the general assembly of the State. In response to this act Tennessee on July 26, 1820, passed an act (Laws 1820, chapter 22) authorizing the governor of this State to appoint three commissioners to meet the North Carolina commissioners to settle, run, and re-mark the boundary line between the States, agreeably to the true intent and meaning of the Cession Act, and further providing that whatsoever the commissioners or a majority of those of each State

shall do in the premises shall be binding on this State. The commissioners were accordingly appointed and on August 31, 1821, reported that they had met with the commissioners from North Carolina to settle, run and mark the dividing line between the two States, from the termination of the line run by McDowell, Vance, and Matthews in 1799, to the southern boundary of said States, and that they had run and marked said dividing line as directed and returned with their report a plot or map of the line. A similar report was made to North Carolina by her commissioners, and the reports were submitted by the governors of the respective States to their legislatures and each State by an act of her legislature of 1821, ratified and confirmed the action of this joint commission. This action by the commissioners expressly recognized the line previously run from the Virginia line to the top 'of Smoky Mountain by McDowell, Matthews, and Vance in 1799, and limited their work to extending the boundary line from that point to the Georgia line as the southern boundary line of North Carolina and Tennessee, and it would seem that the North Carolina and Tennessee legislatures by adopting and confirming their action likewise recognized the line of 1799, but nothing affirmative on that subject appears in the acts. However, on September 21, 1832, the Tennessee legislature adopted a joint resolution (Laws 1832, page 58) referring to the previous act of the Tennessee legislature of November 4, 1805, in regard to that part of the line of 1799, from the top of Bald

Mountain to the Painted Rock on French Broad river and authorized the governor to open correspondence with the governor of North Carolina upon the propriety of appointing commissioners on the part of each State to run and mark said line according to the true intent and meaning of the Cession Act. Nothing appears in this record as to any action taken under that resolution. It does appear, however, that at various dates from 1831 to 1847 the State of Tennessee made a considerable number of grants of land along this 1799 line making it the boundary of said grants including the part of the line in dispute in this case, and also that part of the line mentioned by the act of 1805, and the resolution of 1832 above recited. Nearly all of these lands along this line, from the top of Bald Mountain to the French Broad river, were entered by, and granted to, a former member of this court, Judge Jacob Peck, and members of his family. He was a resident of Jefferson county, in the Eastern division of the State, an eminent land lawyer, and evidently thoroughly familiar with the existence and history of this State line. In 1881 North Carolina passed an act (Laws 1881, chapter 347) authorizing the governor of that State to appoint a competent commissioner to act with surveyors or commissioners appointed or to be appointed by any of the contiguous States including Tennessee to re-run and re-mark by some permanent monument at convenient intervals not greater than five miles the boundary lines between that State and any of said contiguous States. It also provided

that if such commissioners disagreed, the governor was authorized to appoint arbitrators to settle their disagreements, and directed a report of their action to the general assembly of the State.

Tennessee in 1885 passed an act (chapter 80) appointing three commissioners, William E. Tilson, Frank H. Hannum, and David White of Unicoi county, to act in conjunction with the commissioners of the State of North Carolina, who should run and mark the State line between said States, commencing on the Iron Mountain at the Indian Grave Gap and run the same to the point where the Jonesboro and Asheville, North Carolina, road passes through the Bald Mountain. This section of the line embraced that part now in dispute in this case. It further provided that said commissioners should ascertain the true line between said States, between said points, and mark the same as was provided to be done by the commissioners of both States when the same was last done. Here is a recognition of the former survey.

The governor of North Carolina appointed a commission headed by J. M. Gudger to meet this commission, and to run this line. In 1886 they did meet and run the line, but when they came to that part now in controversy, the North Carolina commissioners insisted on re-running and re-marking the line as run by the North Carolina commissioners in 1799, and attempted to do that while the commissioners for Tennessee insisted that the true line according to the meaning and intent of the Cession Act should run by

what is designated in this record as the "watershed line," and they did run and mark such a line, and it is that line which is now insisted on by the complainants as the true line between the State of Tennessee and North Carolina, and the true boundary line of the land sued for in this case. In other particulars and parts of the line so run by these commissioners there seems to have been no disagreement. The North Carolina commissioner reported his action to the governor of North Carolina, together with the disagreement of the Tennessee commissioners and their action in running this so-called watershed line, but it does not appear that the Tennessee commissioners made any report of their action, and no action by either the State of Tennessee or of North Carolina appears to have been taken on these surveys. On March 11, 1889, North Carolina passed another act authorizing the governor to appoint commissioners to re-run and re-mark the line between that State and contiguous States, including Tennessee, but no action seems to have been taken under this act, either by Tennessee or by the governor or commissioners of North Carolina. In 1908, North Carolina brought a suit against Tennessee in the supreme court of the United States to settle disputes which had arisen between the States, or citizens thereof, over the true location of certain parts of the line run and fixed by the commissioners in 1821. The results of that suit are shown by the report of the action of the court in *North Carolina* v. *State of Tennessee,* 235 U. S., 1, 35 Sup. Ct., 8, 59 L. Ed., 97, here-

inafter referred to. This litigation was immediately induced by previous suits between citizens of the States over conflicting grants of the same lands by the two States; the result of which, by the judgment of the United States circuit court of appeals at Cincinnati, are reported in the cases of *Belding* v. *Hebard*, 103 Fed., 523, 43 C. C. A., 296, and *Stevenson* v. *Fain*, 116 Fed., 147, 53 C. C. A., 467.

Reverting now to the action of the North Carolina commissioners in 1799 affecting the particular part of the State line involved in this controversy, we find that the Iron Mountain referred to in the Cession Act ends at its south or southwestern extremity rather abruptly, where the Nolachucky river runs through it; but the river, in cutting through the body of the mountain, passes through a gorge by a tortuous course of about eight miles in length, and in a direct line probably two or three miles. On the opposite side of the river, and generally speaking parallel thereto, is a range of mountains running in a general east and west course, the eastern part of which is known as Flat Top Mountain and the western part as No Business Ridge or Mountain, the two being connected by a lower ridge, making a rather decided gap between; then going southward, or southwestward, there intervenes a valley or depression between this mountain range and the next, known as Bald Mountain, on which are two distinct and prominent peaks, known as the "Little Bald" and the "Big Bald" Mountains. From the eastward, leading up to these peaks, is a ridge locally

known as "Chestnut Ridge," running somewhat paral-
lel to the Flat Top Mountain. Between these two
mountains, Flat Top and Chestnut Ridge, lies the val-
ley or depression above mentioned, locally known as
"Coxe's Cove." In this valley or cove there is a di-
vide or watershed, from which the waters flow east-
ward by Big Creek and westward by Granny Lewis
creek and Spivey creek; but from both sides of this
divide the waters ultimately flow westwardly into the
Nolachucky river, and eastwardly into the same river,
called, however, in North Carolina, the "Toe river."
In other words, the waters of Big creek flow east-
wardly around the Flat Top Mountain into the Toe
river, while the waters of Granny Lewis creek and
Spivey creek flow westward around No Business Ridge
or Mountain, into the Nolachucky river. There is one
point on the summit and for some distance down the
face of the Iron Mountain from which, looking south-
ward, the Little and Big Bald Mountains or peaks can
be seen at a distance of from six to eight miles; the
Little Bald being the nearer by a couple of miles.
There is about five hundred feet difference in the ele-
vation of these mountains, the Big Bald being the
higher; but looking from the point referred to on the
Iron Mountain the Little Bald Mountain, owing to its
nearer situation, appears to be the higher and more
prominent. The two are connected by a high ridge of
the Bald Mountain range. From the point on the Iron
Mountain referred to, the Big Bald is about ten de-
grees further west than the Little Bald. When the

commissioners had run the line to the southwestern end of the Iron Mountain to the point above referred to where they could sight these peaks of the Bald Mountains through the gap between the Flat Top and No Business Mountain, the calls of their lines are as follows:

"Call 572: South 10 west 28 poles descending.

"Call 573: South 23 west descending the Iron Mountain crossing Nolachucky at 220 poles at the mouth of a laurelly branch; then partly up said branch and partly on the spurs of the mountain to the top of a high mountain; then crossing Devils creek at the distance of 1,230 poles, one continuing laurel thicket from Nolachucky to this place, whole distances of 4 miles 133 poles to the top of Little Bald Mountain.

"Call 574: South 49 west, 2 miles to the top of Big Bald."

The line in dispute in this case is call No. 573 from the Iron Mountain where the Nolachucky river runs through the same to the top of the Bald Mountain, as defined in the Cession Act, and to the top of Little Bald Mountain, as described in the commssioners' report. This line crosses Nolachucky river at the mouth of a laurelly branch as named by the commissioners, now called Devils creek, and, as shown by a diary kept by the commissioners, was called at that time the Devils Arse, but the commissioners evidently decided to give it the more polite name of a laurelly branch. This branch or creek rises at the foot of the ridge connecting Flat Top and No Business Moun-

tains, and flows northward through a rough narrow gorge into the Nolachucky river, with a number of spurs or ridges projecting along the way from both sides. This line called for by the commissioners runs in a general course up this gorge and along and across Devils creek, crosses the ridge or gap between Flat Top and No Business Mountains; then crosses the Coxe's Cove depression, running very near the head spring of Granny Lewis creek, and crosses the headwaters of Spivey creek, called by the commissioners Devils creek; thence ascends a ridge of the Bald Mountain to the top of the Litle Bald Mountain. Hence it will be seen that it does not follow any watershed.

The Tennessee commissioners in 1886, instead of rerunning this call of the North Carolina commissioners of 1799, conceived the idea that the true line called for by the Cession Act required them to find and follow a watershed from the Nolachucky river where it runs through the Iron Mountain to the top of the Bald Mountain, and in order to do this they left the top of the Iron Mountain at a point somewhat northeast of the point where the North Carolina commissioners had left it and pursued a ridge running southward from that point towards the Nolachucky river, and crossed the river from that point by a line to an opposite ridge of the Flat Top Mountain; followed this ridge to the summit of Flat Top; descended Flat Top to the low divide or watershed above referred to in Coxe's Cove; followed that to the Chestnut ridge,

ascended the same to a point which is denominated
Rocky Knob or Big Rock, and then followed the top
of this ridge to the summit of Little Bald Mountain,
and there met the line of the North Carolina commis-
sioners. They marked this watershed line as the true
State line. As stated above, Captain Gudger, the com-
missioner of North Carolina at that time, undertook
to follow and mark the line as run by the North Caro-
lina commissioners in 1799, and, as hereinbefore stated,
these are the two lines which beget this present con-
troversy.

The complainants object to the 1799 line principally
upon the ground that it does not follow the watershed,
but they attack it also on the ground that the course
called for by the commissioners is not the correct
course, allowing what they assert to be the proper
variation, and that the distance called for, four miles
and one hundred and thirty-three poles from the Nola-
chucky river, is incorrect, in that the true distance is
about six miles. They have procured and introduced
in evidence the field notes of the surveyors running
this line in 1799 and the diary kept by one of the com-
pany, showing that this territory was exceedingly
rough and offered great difficulties in passing through
it, and that instead of surveying the straight line
called for they surveyed a crooked line of many calls
over such territory as was passable, and afterwards
reduced that survey to a straight line, and assert that
in this reduction to a straight line they missed both
the true course and distance of it. It is apparent from

the weight of this evidence that they did make a mistake, and a considerable mistake, in the distance. It does not so clearly appear that the course was mistaken. It is now run with a variation of five degrees and thirty minutes, to wit: On the call of south twenty-eight degrees and thirty minutes west, whereas the complainants and their witnesses say that it should be run on a variation of only four degrees and thirty minutes, and from their assumed point of departure from the end of Iron Mountain that it can only be run on a course at present of south thirty-two degrees west. This variance, however, is produced entirely by a change of the starting point from the face of Iron Mountain. It is possible that the course called for by these commissioners of south twenty-three degrees west is mistaken by a degree, and should have been south twenty-four degrees west, which can easily be accounted for by the mistake made in their measurement of distance in calculating the course of a straight line. The resultant of their zigzag survey of four miles and one hundred and thirty-three poles, and a like survey of a distance of practically six miles, would evidently show some considerable difference in the course indicated. This of course is merely conjectural. They could have made the course certain by sighting direct and reverse from one mountain to the other. However this may be, we regard it as utterly immaterial, as a mistake in both course and distance is easily corrected by the call from one mountain to the other, both of which are permanent in their loca-

tion, and very prominent and well known. That will, of course, control the calls for course and distance. The only element of doubt, if doubt there could be, on this point is to determine the exact point on the Iron Mountain from which they began this line. That has been reduced, however, to a practical certainty by the engineers and surveyors introduced by the defendant in this case. The discrepancies shown by the witnesses of the complainants have been begotten not in the effort to relocate and survey this line of the commissioners of 1799, but in the effort to locate and survey what they now conceive to be the line which those commissioners should have located and surveyed, and in doing that they have assumed an entirely different point of departure from the end of the Iron Mountain. That, of course, can easily be done when the end of the mountain, generally speaking, covers a width or distance of two or three or more miles.

The real issue in this case is where the State line is, not where it ought to be. This court has no jurisdiction or power to establish a line between these States. Neither State is a party to this suit. Such a line must be established either by compact of the sovereign States themselves (*Poole* v. *Fleeger*, 11 Pet., 185, 9 L. Ed., 680; *Rhode Island* v. *Massachusetts*, 12 Pet., 657, 9 L. Ed., 1233), or, if by judicial proceedings, then by decree of the United States supreme court. That court, by a provision of the United States constitution (article 3, section 2), has original and exclusive jurisdiction over such an issue. *Virginia* v. *Tenn.*,

148 U. S., 503, 13 Sup. Ct., 728, 37 L. Ed., 537.    But this court in the suit of private parties may fix and adjudge the actual location of a line as affecting the boundaries of their lands.   The chief contention of the complainants is that what they call the watershed line is the one intended by the Cession Act of 1789, and in support of that they quote from the opinion of Judge Lurton in the case of *Belding* v. *Hebard*, 103 Fed., 523, 43 C. C. A., 296, to this effect:

"The intention of the North Carolina Cession Act of 1789 was to make the crest of the great mountain ranges extending across the State of North Carolina in a southwestwardly direction the boundary line of the ceded territory.   This is most evident from even a casual reading of the boundary line therein described."

While this is generally true there are many notable exceptions.   It is a physical impossibility to find a continuous watershed line along the calls given in the Cession Act of 1789.   The mountains along this line are broken and separated by the passage from east to west through them of various water courses, some of which are the Wautauga, the Nolachucky, the French Broad, the Big Pigeon, the Little Tennessee, and the Hiawassee rivers.   At each of these breaks not only the continuity of the watershed is destroyed, but numerous subsidiary and lateral watersheds into these several streams on both sides are found.   So that in attempting to find a watershed line from one of these streams to the next, it would open the ques-

tion to discretion and judgment as to what one should be followed leading up from the water course to the main top or extreme height of the adjoining mountains.

The Tennessee commissioners in 1886 showed considerable ingenuity in finding the watersheds followed on their line, but others, both to the east and west of it, can be found. The United States Geological Survey of this district followed and indicated the same line as the boundary line between these States, and the same is so shown on their maps. Upon this fact the complainants largely rely to establish this as the correct line, but the Geological Survey was without authority in this matter, and did not undertake to establish but merely to represent, what they gathered from local information to be the State line. They evidently procured their information from Tennessee claimants as their survey was made subsequent to the action of the Tennessee commissioners in 1886.

As was said by the supreme court of the United States in the case of *North Carolina* v. *Tennessee,* 235 U. S., 1, 35 Sup. Ct., 8, 59 L. Ed., 97:

"The Cession Act is very general and necessarily demanded definition to satisfy the requirements of a boundary line, a line not only necessary to mark private property but political jurisdiction."

In defining this boundary by running, locating, and marking the same on the ground a large degree of discretion and judgment must necessarily have been delegated to the commissioners appointed for that

McCarty v. Carolina Lumber Co.

purpose, and it appears from their action that they did not interpret the Cession Act to hold them with absolute strictness to the watershed line, as is evidenced by the line as found and fixed by the circuit court of appeals at Cincinnati, in the case of *Stevenson* v. *Fain,* 116 Fed., 147, 53 C. C. A., 467, supra, and by the supreme court of the United States in the case of *North Carolina* v. *Tennessee,* 235 U. S., 1, 35 Sup. Ct., 8, 59 L. Ed., 97.

By the way, the line which was in controversy in the case of *Belding* v. *Hebard,* 103 Fed., 523, 43 C. C. A., 296, which the circuit court of appeals found to run with the watershed, the supreme court in this case of North Carolina against Tennessee, largely on newly discovered evidence, rejected, and found the true line to be the Slick Rock line, not the watershed line.

Another notable departure by the commissioners of 1821 from the watershed line was the last line running from the one hundred and one-mile tree a due south course, crossing the Hiawassee river and extending on the same course to the Georgia line, in all about fifteen or sixteen miles, without regard to the watershed, thereby locating in Tennessee, which otherwise would have been located in North Carolina, the present very rich Ducktown copper district. The legislatures of both States in 1821 gave sanction to this construction of the Cession Act by the commissioners by passing acts ratifying and adopting the line as run.

In our opinion the commissioners of 1799 correctly interpreted the call of the Cession Act, to wit: From

the end of the Iron Mountain where the Nolachucky river runs through the same to the top of Bald Mountain. This call would indicate a straight line from the one point to the other.

In view of this fact the point of departure from the Iron Mountain selected by them from which they could see the two peaks of the Bald Mountains, Little and Big, was the proper, if not the only, one to be selected. Some question might have arisen as to which peak of the Bald Mountain was intended as the other terminus of this line.

In November, 1796, North Carolina granted to Jno. G. Blount a large boundary of land containing some 320,000 acres, which was intended to be bounded by the State line along this course, and in surveying the boundaries of that grant from the south to the northeastward, the surveyor ran and located the line as the State line under the Cession Act from the top of Big Bald Mountain, 2,020 poles (it now appears to be 2,120 poles), to the Nolachucky river where it breaks through the Iron Mountain, and the latter point was substantially the same point on the Iron Mountain from which the State line commissioners in 1799 ran their line. It is shown by the witnesses that from the top of Big Bald Mountain, as well as from the top of Little Bald Mountain, this particular face of the Iron Mountain is visible through the gap between the Flat Top and No Business Mountains as a very confined or restricted spot. Had the commissioners seen fit to follow this interpretation of the Cession Act, we could

see no valid objection; but we think they gave a better interpretation to the Cession Act by running to the nearer peak or top of Bald Mountain, to wit, the Little Bald, thence following the top of the range to Big Bald.

The complainants, however, insist that they should have run from the Iron Mountain to the top of Flat Mountain as a part of the Bald Mountain Range, and thence followed the watershed to Little Bald and Big Bald. Conceding that they might, or even should, have done this in their discretion and best judgment in interpreting the call of the Cession Act, the fact remains that they did not do it, and this court has no power to revise and correct their action. But we are of opinion that had they done this they would have been in error for the reason that we cannot find as a fact that the Flat Top Mountain is any part of the Bald Mountain Range. It has not only always been called and known as a separate mountain, but as a physical fact it is separate. The watershed referred to in Coxe's Cove is too insignificant in elevation to indicate any continuation of the one range into the other. The continuation of Bald Mountain range at this point is by the Chestnut Mountain or Ridge, turning eastward and running almost parallel with the Flat Top Mountain until it ends at the Caney creek, a tributary to the Nolachucky or Toe river in North Carolina.

It is further claimed by the complainants that this line run by the North Carolina commissioners in 1799

was not marked plainly, while the other line showed its marks. As a matter of fact the former line does show several marked trees, and tradition indicates a number of others which have disappeared, but lacking such marks, the natural objects, to wit, the two mountains called for, would establish the line and would even override the incorrectness of the line marked by trees or other artificial monuments.

"Mountains and streams will control artificial monuments, such as marked trees." *Ayres* v. *Watson,* 113 U. S., 596, 11 Sup. Ct., 201, 34 L. Ed., 803.

Some proof is introduced as to the inhabitants of this disputed region paying taxes and sending their children to school in Tennessee. For a long time this was a very wild, inaccessible, and uninhabited region. One Hensley made a settlement on the Tennessee side of this line, but very near the line, and he and some other families after him resided there a number of years and paid taxes and sent their children to school in Tennessee. One other settlement was made east of the Hensley place, to wit, by Jesse Martin, in which he and some other families subsequent to him lived, and possibly they paid taxes and more certainly sent their children to school in Tennessee. They had access to none other, and at that time—in more recent years —grantees under Tennessee grants were asserting the watershed line as the State line. So it is not strange that the Tennessee schools admitted these children. So far as granting these lands is concerned, the Tennessee grants up to 1847 followed and called for this

line of the North Carolina commissioners of 1799. The calls of one grant to Irwin of 1856 render it somewhat doubtful as to whether it intended to call for this line or the watershed line. It was a younger grant, however, by parties interested in an older grant calling for the other line. Not until 1890, after the Tennessee commissioners of 1886 had run and marked the watershed line, was any grant made which distinctly called for this watershed line. That grant was to one Hensley. It appears that the complainants deraign their title not only from this Hensley grant covering the disputed territory, but also from the Irwin grants, one or both of which called for the other line as the Tennessee line. So far as the few citizens of North Carolina and Tennessee who knew this region and occasionally visited it and the fewer who resided near it or in it are concerned, it appears that some claimed the one line and some the other to be the State line, and some even the line of the Blount Grant, and certainly after 1886 there was some considerable doubt and conflicting claims as to the true location of the State line. These circumstances we regard as altogether inconclusive and of little or no weight in determining this question. It is perfectly clear that the commissioners of 1799 ran and fixed a line from one of these mountain tops to the other, and we do not think any of these circumstances will in any way interfere with or change that line.

We are further of opinion, from the history hereinbefore recited, that Tennessee not only knew of the loca-

tion of this line by the North Carolina commissioners, but taking her action and inaction altogether into account, she acquiesced in, and in a large measure, adopted this as the boundary line between the States. Her only dissents from it were spasmodic, and contemplated further action on the part of North Carolina in conjunction with Tennessee in changing or relocating certain parts of the line. Nothing of this kind, however, was ever done.

So long as this line of 1799 remains unchanged by effectual negotiations or litigation between North Carolina and Tennessee, it must be treated as correct, and agreeable to the true intent and meaning of the Cession Act and both sovereign parties interested. Certain it is that it cannot be changed at the suit of private individuals or citizens of one State against those of the other, in a court without power or jurisdiction in the first instance to settle and establish such a line, even in a suit of one State against the other.

In *Virginia* v. *Tennessee,* 148 U. S., 503, 13 Sup. Ct., 728, 37 L. Ed., 537, it was held that a boundary line between States which has been run out, located, and marked upon the earth and afterwards recognized and acquiesced in by them, for a long course of years, is conclusive, even if it be ascertained that it varies somewhat from the courses given in the original grant.

To the same effect is the holding in the case of *Maryland* v. *West Virginia,* 217 U. S., 1, 30 Sup. Ct., 268, 54 L. Ed., 645.

McCarthy v. Carolina Lumber Co.

During the progress of this case, the complainants amended their original bill and averred that the defendant was estopped to deny the so-called watershed line as the true line between these States, and the boundary line between the complainants' and defendant's lands, by reason of a certain judgment of the United States district court at Asheville, N. C.   On September 14, 1905, a suit in ejectment and to enjoin trespass and waste was brought in the superior court of Buncombe county, N. C., by W. T. Weaver, and others, against Indian Creek Lumber Company, and others, involving some or all of the lands in controversy in this case.   That suit was removed by the defendants to the United States district court, and there put at issue by general denial of the plaintiffs' allegations.   On June 24, 1912, judgment was entered by that court to this effect:

"And it appearing from an examination by the court that the lands in controversy and about which this suit is brought are on the Tennessee side of the United States Geological line, as shown by the testimony taken by the referee, it is therefore adjudged that this court has no jurisdiction over the subject-matter of the said action, and it is therefore dismissed, however, without prejudice to such party or parties as may be interested in the lands in controversy."

The plaintiffs in that suit are averred to be the predecessors in title of the defendant in the present suit, and the defendant in that suit to be a privy or agent of the complainants in this suit, and that this judg-

ment of the United States district court precludes the
defendant in the present controversy. The defendant
meets this contention by showing that its original and
real vendor of the lands in dispute is the Big Creek
Lumber Company, not a party to the North Carolina
suit. The defendant took title to these lands by war-
ranty deed from the Big Creek Lumber Company, and
it also bought adjoining lands from Weaver and
others, known as the Johnson heirs, who would and
did convey only by quitclaim deed. In preparing that
deed the defendant's counsel used in the description
a general boundary which embraced not only the lands
purchased from the Johnson heirs, but also the lands
conveyed by the Big Creek Lumber Company, as afore-
said. The defendant further insists that the Indian
Creek Lumber Company was neither a privy or repre-
sentative of the complainants. The relation, if any,
of this corporation to the complainants is not clearly
disclosed in the record. It is indicated that the Indian
Creek Lumber Company had been organized for the
purpose of taking timber from these lands, and that
N. B. McCarty, the owner of these lands, owned the
majority of the stock in this Indian Creek Lumber
Company, and from those circumstances complainants
would infer the alleged relation between McCarty and
this corporation.

Mr. Charles Ford, next friend of the minor com-
plainant, testified, however, that the Indian Creek
Lumber Company had no deed or contract for these
lands from McCarty, and the record is entirely silent

as to whether it had any contract for timber or acted as agent of McCarty. But aside from these questions this judgment appears on its face to have been without prejudice to the rights of the parties so far as the title to the lands is concerned. The only point of adjudication is that the federal court did not have jurisdiction, and that adjudication was rested upon the location not of the true line between the States, but of .the United States Geological line. As hereinbefore indicated, that line was not determinative of the State line, neither could the judgment of the United States court at Asheville change that line from its true location. As a matter of fact it did not undertake to do so. We do not think that this judgment amounts to an estoppel on the parties to that suit as to the true boundaries of the lands, and furthermore that it cannot in any way aid the title of complainants in this case; and for all these reasons it cannot estop the defendant in this case upon the issues herein involved.

The appellants further complain of the action of the court below in overruling certain exceptions made on the hearing to evidence introduced by the defendant. We have examined these exceptions and do not think they are well made. On the hearing of the case in the court below the chancellor found the issues in favor of the defendant and dismissed the complainants' bill. To this action the complainants excepted and appealed, and in this court have assigned errors to the effect that the chancellor erred in his conclusions and should

134 Tenn. 5 ·

have found the issues in favor of the complainants. For the reasons already stated in this opinion, we conclude that there is no error in the chancellor's decree, and it is therefore affirmed, with costs.

W. R. TURNER, Special Justice, sat in lieu of WILLIAMS, J., who was disqualified because of having been of counsel in the court below.